## GREGORY HOGAN *v.* DEPARTMENT OF CHILDREN AND FAMILIES
### (SC 18009)

Rogers, C. J., and Norcott, Katz, Zarella and Schaller, Js.

---

Argued November 17, 2008—officially released March 10, 2009

*Raymond J. Rigat,* for the appellant-appellee (plaintiff).

*John E. Tucker,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, *Gregory T. D'Auria,* associate attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee-appellant (defendant).

*Opinion*

KATZ, J. The plaintiff, Gregory Hogan, filed an administrative appeal in the trial court from the decision of the defendant, the department of children and families, challenging its findings that the plaintiff was responsible for the abuse of a child and that he posed a risk to the safety and well-being of children such that his name should be placed on the central child abuse and neglect registry (registry) maintained by the defendant pursuant to General Statutes § 17a-101k.[1] The plaintiff also

[1] General Statutes § 17a-101k provides: "(a) The Commissioner of Children and Families shall maintain a registry of the commissioner's findings of abuse or neglect of children pursuant to section 17a-101g that conforms to the requirements of this section. The regulations adopted pursuant to subsection (i) of this section shall provide for the use of the registry on a twenty-four-hour daily basis to prevent or discover abuse of children and the establishment of a hearing process for any appeal by a person of the commissioner's determination that such person is responsible for the abuse or neglect of a child pursuant to subsection (b) of section 17a-101g. The information contained in the registry and any other information relative to child abuse, wherever located, shall be confidential, subject to such statutes and regulations governing their use and access as shall conform to the requirements of federal law or regulations. Any violation of this section or the regulations adopted by the commissioner under this section shall be punishable by a fine of not more than one thousand dollars or imprisonment for not more than one year.

"(b) Upon the issuance of a recommended finding that an individual is responsible for abuse or neglect of a child pursuant to subsection (b) of

section 17a-101g, the commissioner shall provide notice of the finding, by first class mail, not later than five business days after the issuance of such finding, to the individual who is alleged to be responsible for the abuse or neglect. The notice shall:

"(1) Contain a short and plain description of the finding that the individual is responsible for the abuse or neglect of a child;

"(2) Inform the individual of the existence of the registry and of the commissioner's intention to place the individual's name on the registry unless such individual exercises his or her right to appeal the recommended finding as provided in this section;

"(3) Inform the individual of the potential adverse consequences of being listed on the registry, including, but not limited to, the potential effect on the individual obtaining or retaining employment, licensure or engaging in activities involving direct contact with children and inform the individual of the individual's right to administrative procedures as provided in this section to appeal the finding; and

"(4) Include a written form for the individual to sign and return, indicating if the individual will invoke the appeal procedures provided in this section.

"(c) (1) Following a request for appeal, the commissioner or the commissioner's designee shall conduct an internal review of the recommended finding to be completed no later than thirty days after the request for appeal is received by the department. The commissioner or the commissioner's designee shall review all relevant information relating to the recommended finding, to determine whether the recommended finding is factually or legally deficient and ought to be reversed. Prior to the review, the commissioner shall provide the individual access to all relevant documents in the possession of the commissioner regarding the finding of responsibility for abuse or neglect of a child, as provided in subsection (m) of section 17a-28.

"(2) The individual or the individual's representative may submit any documentation that is relevant to a determination of the issue and may, at the discretion of the commissioner or the commissioner's designee, participate in a telephone conference or face-to-face meeting to be conducted for the purpose of gathering additional information that may be relevant to determining whether the recommended finding is factually or legally deficient.

"(3) If the commissioner or the commissioner's designee, as a result of the prehearing review, determines that the recommended finding of abuse or neglect is factually or legally deficient, the commissioner or the commissioner's designee shall so indicate, in writing, and shall reverse the recommended finding. The commissioner shall send notice to the individual by certified mail of the commissioner's decision to reverse or maintain the finding not later than five business days after the decision is made. If the finding is upheld, the notice shall be made in accordance with section 4-177 and shall notify the individual of the right to request a hearing. The individual may request a hearing not later than thirty days after receipt of

on the grounds that it is vague, violative of separation of powers and constitutes a bill of attainder. The trial court rejected the plaintiff's constitutional claims, but concluded that it could not determine whether the defendant's decision to place the plaintiff's name on the registry was proper because one factor cited in that

the notice. The hearing shall be scheduled not later than thirty days after receipt by the commissioner of the request for a hearing, except for good cause shown by either party.

"(d) (1) The hearing procedure shall be conducted in accordance with the procedures for contested cases pursuant to sections 4-177 to 4-181a, inclusive.

"(2) At the hearing, the individual may be represented by legal counsel. The burden of proof shall be on the commissioner to prove that the finding is supported by a fair preponderance of the evidence submitted at the hearing.

"(3) Not later than thirty days after the conclusion of the hearing, the hearing officer shall issue a written decision to either reverse or uphold the finding. The decision shall contain findings of fact and a conclusion of law on each issue raised at the hearing.

"(e) Any individual aggrieved by the decision of the hearing officer may appeal the decision in accordance with section 4-183. Such individual may also seek a stay of the adverse decision of the hearing officer in accordance with subsection (f) of section 4-183.

"(f) Following the issuance of a decision to uphold the finding and absent any stay of that decision issued by the commissioner or the court, the commissioner shall accurately reflect the information concerning the finding in the child abuse and neglect registry maintained pursuant to subsection (a) of this section and shall, in accordance with section 17a-101g, forward to any agency or official the information required to be disclosed pursuant to any provision of the general statutes.

"(g) Any individual against whom a finding of abuse or neglect was substantiated prior to May 1, 2000, and who has not previously appealed such finding, may appeal such finding as provided in this section.

"(h) Records containing unsubstantiated findings shall remain sealed, except that such records shall be made available to department employees in the proper discharge of their duties and shall be expunged by the commissioner five years from the completion date of the investigation if no further report is made about the individual subject to the investigation, except that if the department receives more than one report on an individual and each report is unsubstantiated, all reports and information pertaining to the individual shall be expunged by the commissioner five years from the completion date of the most recent investigation.

"(i) Not later than July 1, 2006, the [commissioner] shall adopt regulations, in accordance with the provisions of chapter 54, to implement the provisions of this section."

decision was not supported by the record. Accordingly, the trial court remanded the case to the defendant for a determination of whether the plaintiff's name should appear on the registry in the absence of this factor. The plaintiff appeals, and the defendant cross appeals, from that decision.[2] We conclude that: (1) the trial court improperly determined that one of the factors relied on by the defendant in deciding that the plaintiff's name should be placed on the registry was not supported by the record and therefore improperly remanded the case to the defendant; (2) the defendant's finding that the plaintiff posed a risk to children such that his name should be placed on the registry was supported by the record; and (3) the trial court properly rejected the plaintiff's constitutional challenges to the registry scheme. Accordingly, we reverse in part the decision of the trial court.

The record reveals the following undisputed facts and procedural history. The plaintiff was employed as a shift supervisor at the New Haven juvenile detention center (detention center) during the period pertinent to the issues in this appeal. In early 1999, the defendant commenced an investigation into conduct of the detention center's staff and management after receiving an anonymous complaint alleging abuse and neglect of juvenile detainees. As a result of that investigation, the defendant concluded that several allegations of abuse or neglect against the plaintiff had been substantiated and thereafter terminated his employment. One of those allegations related to an incident in May, 1998, in which a detainee, Felix P.,[3] had been physically assaulted by another detainee whom the plaintiff had placed in Felix'

[2] The parties respectively appealed and cross appealed from the trial court's decision to the Appellate Court, and we transferred the appeals to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] In accordance with General Statutes § 54-86e and the courts' policy of protecting the privacy interests of minor children, the minors involved in the various incidents at issue are not identified by their full name.

room. The plaintiff thereafter unsuccessfully challenged his termination, first through arbitration and later through an action in federal court.

At some point in early 2005, the plaintiff learned that his name had been placed on the registry maintained by the defendant. At that time, the defendant had no internal procedures in place to challenge such decisions. In June, 2005, the plaintiff sought to have his name removed from the registry by way of an action in federal court, claiming that the defendant had placed his name on the registry without affording him due process. While that case was pending, the legislature enacted Public Acts 2005, No. 05-207, § 1 (P.A. 05-207), which, inter alia, added the administrative procedures now set forth in subsections (b) through (i) of § 17a-101k. See footnote 1 of this opinion. Thereafter, the parties reached a settlement agreement under which the federal case would be dismissed with prejudice, and, in accordance with P.A. 05-207, the defendant would provide the plaintiff with an internal review of its allegations and, upon request, an administrative hearing if the review upheld the defendant's findings.

After the defendant conducted an internal review and notified the plaintiff that it had substantiated allegations of physical abuse by the plaintiff against Felix and two other detainees to support its decision to place the plaintiff's name on the registry,[4] the plaintiff requested an administrative hearing. Thereafter, a hearing officer of the defendant conducted a hearing and issued a final decision. The hearing officer upheld the defendant's finding that the plaintiff was responsible for Felix' physical abuse, but reversed its finding with respect to the

---

[4] The defendant initially had deemed as substantiated an allegation of physical neglect of a fourth detainee by the plaintiff, but the defendant ultimately decided not to pursue this allegation.

two other detainees.[5] The hearing officer further found that the recommendation to place the plaintiff's name on the registry should be upheld.

In support of its finding that the plaintiff was responsible for the abuse of Felix, the hearing officer made the following factual findings. On May 29, 1998, Felix had acted out verbally and physically when the plaintiff asked him to go to his room. Two officers had to escort Felix to his room, where the plaintiff put handcuffs and leg irons on him and directed him to remain on his bed. After Felix refused to remain on his bed and stood up, the plaintiff placed him back on the bed and left the room. Some time later, detention officers heard Felix "banging" in his room and other detainees shouting, demanding to be let into Felix' room. The plaintiff went to Felix' room and told him that, instead of using restraints, he was going to place another detainee, Michael C., in the room to counsel him. Michael was much larger than Felix and known to be a bully. A detention officer heard the plaintiff tell Felix that he would not open the door again and that Michael would not be disciplined if he beat up Felix. Michael was left in the room with Felix while all but one officer left the floor for a staff meeting. Michael thereafter assaulted Felix to the extent that, two days later, his face still was swollen and bruised. The hearing officer did not find the plaintiff's claim credible that he had intended only for Michael to offer "peer counseling," noting the "virtual lynch mob atmosphere" that had preceded the decision to put Michael in the room and Felix' smaller stature that undoubtedly had put him at a "serious disadvantage . . . ." Thus, the hearing officer found that

[5] The hearing officer found that the allegations that the plaintiff physically had abused two other detainees were not supported by the evidence because there was no evidence either that the plaintiff had injured these persons by anything other than accidental means or that he had allowed anyone else to injure them.

the evidence supported the conclusion that the plaintiff had abused Felix by allowing a nonaccidental injury to be inflicted on one child by another.

To determine whether it was appropriate to place the plaintiff's name on the registry, the hearing officer noted the following principles. Registry placement was required "when there has been a determination that the person responsible for child abuse or neglect poses a risk to the health, safety or well-being of children." To determine whether there was such a risk in the present case, various criteria had to be considered, including the plaintiff's intent, the severity of the incident, the "chronicity" of the plaintiff's behavior—meaning whether the substantiated abuse was not an isolated incident—and whether excessive force had been used. Applying these factors, the hearing officer found: "[The plaintiff's] conduct demonstrates either a conscious decision to use one child to harm another, or else a serious disregard for [Felix'] well-being. The evidence supports a finding that this was not an isolated incident, but, rather, a pattern of behavior by the [plaintiff] to induce compliance on his unit. Other detainees feared for their own safety as a result of the [plaintiff's] conduct. All of these factors support the [defendant's] decision to place the [plaintiff's] name on the [registry] as a person responsible for the physical abuse of [Felix]."

Pursuant to General Statutes §§ 4-183 (a) and 17a-101k (e), the plaintiff appealed from the decision to the trial court, seeking reversal of the hearing officer's findings with respect to: (1) the physical abuse of Felix; and (2) the placement of the plaintiff's name on the registry. The plaintiff also claimed that the registry scheme was unconstitutional on several grounds. The trial court rejected the plaintiff's challenges to the constitutionality of the registry scheme and to the hearing officer's finding that the plaintiff was responsible for the physical abuse of Felix. The court did not decide,

however, whether the hearing officer properly found that the plaintiff's name should be placed on the registry because the court concluded that one factor—chronicity—was not supported by the record; specifically, there was no evidence to support the hearing officer's finding that "this was not an isolated incident . . . ." Because it did not know to what extent the chronicity factor had influenced the hearing officer's decision, the trial court remanded the case to the defendant "for further consideration of whether the plaintiff's name should appear on the registry list." The plaintiff's appeal and the defendant's cross appeal followed.

In his appeal, the plaintiff asserts the following constitutional challenges to the registry scheme, as set forth under P.A. 05-207: (1) it violates the doctrine of separation of powers by delegating the legislature's authority to the defendant without setting forth intelligible principles to guide the defendant's registry decisions and by delegating such authority to the defendant instead of the courts; (2) it is violative of due process because it is overbroad and vague; and (3) it constitutes a bill of attainder. In its cross appeal, the defendant contends that the trial court improperly remanded the case to the hearing officer because the record was sufficient to support the chronicity factor and, in turn, the decision to place the plaintiff's name on the registry. In his response to the defendant's cross appeal, the plaintiff agrees that the remand was improper, but on the ground that the trial court properly concluded that the chronicity factor was not supported by the record and, in the absence of such evidence, the placement of his name on the registry was improper.[6] We conclude that the

---

[6] The plaintiff also makes a vague claim relating to this issue in his main brief to this court, asserting that the trial court "erred by upholding the hearing officer's [registry] determination" because he "does not pose a risk to children sufficient to warrant his placement on the [registry]." In support of this claim, the plaintiff: (1) quotes from the *arbitrator's* decision sustaining his termination wherein the arbitrator opines that the plaintiff's conduct with respect to Felix was out of character; and (2) makes vague statements

trial court improperly remanded the case and that the record supported the hearing officer's decision to place the plaintiff's name on the registry. We further conclude that the trial court properly rejected the plaintiff's constitutional claims.

I

Before reaching the substantive issues presented, we address a jurisdictional question that arises as a result of the procedural posture of the case. Because the trial court remanded the case to the defendant, this court sua sponte raised the question of whether the parties are appealing from a final judgment, as generally required for the exercise of appellate jurisdiction. See *Kelly* v. *New Haven*, 275 Conn. 580, 593, 881 A.2d 978 (2005). Both parties contend that the remand is a final judgment, and we agree.

Section 17a-101k (e) provides that appeals from the defendant's decision to place a person's name on the registry are taken in accordance with § 4-183 of the Uniform Administrative Procedure Act. Section 4-183 (j) (5) provides in relevant part: "The court shall affirm the decision of the [administrative] agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are [inter alia] . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record . . . . *If the court finds such prejudice, it shall sustain*

suggesting that the trial court should have concluded that the hearing officer improperly had failed to rely on or defer to the arbitrator's view of the plaintiff. Although the plaintiff's claim is inadequately briefed; *Taylor* v. *Mucci*, 288 Conn. 379, 383 n.4, 952 A.2d 776 (2008) ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" [internal quotation marks omitted]); as evidenced in part by the absence of any response in the defendant's opposition brief, we address it to the extent that it relates to the issue raised in the defendant's cross appeal.

*the appeal and, if appropriate, may* render a judgment under subsection (k) of this section or *remand the case for further proceedings. For purposes of this section, a remand is a final judgment."* (Emphasis added.)

In *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 673–81, 855 A.2d 212 (2004), we reconsidered whether § 4-183 (j) had codified the test set forth in *Schieffelin & Co.* v. *Dept. of Liquor Control*, 202 Conn. 405, 410, 521 A.2d 566 (1987), for determining whether a remand to an administrative agency constituted a final judgment. "In *Schieffelin & Co.*, we distinguished, for purposes of appellate finality, between two different types of such remands: (1) those in which the trial court had determined that the administrative ruling was in error and ordered further administrative proceedings on that very issue; and (2) those in which the trial court had concluded that the administrative ruling was in some way incomplete and therefore not ripe for final adjudication, for example, where the court required further administrative evidentiary findings 'as a precondition to final judicial resolution of all the issues between the parties.' [Id.], 410. In this regard, remands falling under the former category would constitute final judgments for purposes of appeal, but those falling under the latter category would not. Id." *Commission on Human Rights & Opportunities* v. *Board of Education*, supra, 674. In *Commission on Human Rights & Opportunities*, we confirmed the previous case law that had established that the phrase "this section" in the final sentence of § 4-183 (j) meant subsection (j). Id., 674. Thus, a remand would constitute a final judgment only if it was ordered pursuant to subsection (j). Id. We further determined, however, that, contrary to statements in earlier cases, this sentence was not intended to codify the *Schieffelin & Co.* test. Id., 675. We held, therefore, that "where the court issues a remand pursuant to § 4-183 (j), the

remand is a final judgment for purposes of appeal, *irrespective of both the nature of the remand and the administrative proceedings that are expected to follow it*." (Emphasis added.) Id.

Turning to the present case, the trial court did not state the basis of its authority to order the remand. Although subsection (j) is the only subsection of § 4-183 that expressly refers to remands, we have recognized that orders under subsection (h) fairly may be characterized as remands. See *Lisee* v. *Commission on Human Rights & Opportunities*, 258 Conn. 529, 539, 782 A.2d 670 (2001). We conclude that the remand in the present case, however, falls more properly under subsection (j) of § 4-183 than subsection (h).[7]

Subsection (h) permits the trial court, prior to a hearing on the merits and upon request of a party, to "order that the additional evidence be taken before the agency," which in turn allows the agency to modify its findings or decision. General Statutes § 4-183 (h).[8] In

---

[7] The remand cannot be characterized as ordering an articulation, which would fall outside the scope of § 4-183 altogether, because the trial court remanded "for further consideration of whether the plaintiff's name should appear on the registry list." Although the hearing officer could have responded to the trial court's order by issuing a memorandum of decision stating that the other incidents had been given no weight in the initial decision, the order undoubtedly also would have permitted the hearing officer to reweigh the factors that were supported by the record to determine whether the plaintiff poses a serious risk to the health, safety or well-being of children such that placement of his name on the registry was proper. Indeed, there is nothing in the record to suggest that the trial court intended to retain jurisdiction while the hearing officer reconsidered its decision about whether to place the plaintiff's name on the registry. The judgment provided that the plaintiff's appeal "is hereby dismissed because there is substantial evidence to support the defendant's substantiation of physical abuse on the part of the plaintiff."

[8] General Statutes § 4-183 (h) provides: "If, before the date set for hearing on the merits of an appeal, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon

the present case, the trial court ordered the remand sua sponte, after hearings on the merits, and the parties agreed at oral argument before this court that the remand would not permit the hearing officer to consider new evidence.

Conversely, consistent with subsection (j), the trial court did conclude that "substantial rights of the person appealing have been prejudiced because the administrative findings, inferences . . . [or] conclusions . . . are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record"; General Statutes § 4-183 (j) (5); by virtue of the court's conclusions that the hearing officer's finding regarding the chronicity factor was not supported by the evidence and that the decision to place the plaintiff's name on the registry could not be sustained if that finding was necessary to that decision. Moreover, although it does not fall squarely within the language of § 4-183 (j), we note that the defendant has been prejudiced by the trial court's decision to remand the case despite its conclusion that this finding was unsupported by the record. Indeed, both parties contend that the remand was improper—the defendant contending that the finding of chronicity was supported by the evidence, and the plaintiff contending that, although the trial court properly concluded that there was no evidence to support the finding of chronicity, it should have concluded that, in the absence of such evidence, the hearing officer's decision to place his name on the registry was improper as a matter of law. Therefore, we conclude that the remand falls within § 4-183 (j), and, accordingly, is a final judgment for purposes of appeal, "irrespective of both the nature of the remand and the administrative proceedings that are expected to follow it." *Commis-*

conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court."

*sion on Human Rights & Opportunities* v. *Board of Education,* supra, 270 Conn. 675. In light of this conclusion, we turn to the merits of the appeal and the cross appeal.

## II

Because we eschew unnecessarily deciding constitutional questions; see *Tarro* v. *Commissioner of Motor Vehicles,* 279 Conn. 280, 286, 901 A.2d 1186 (2006); *State* v. *McCahill,* 261 Conn. 492, 501, 811 A.2d 667 (2002); we begin with the issues raised in the defendant's cross appeal. The threshold question is whether the trial court properly concluded that the hearing officer's finding that the incident with Felix was "not an isolated incident"—the chronicity factor—was not supported by the evidence. The defendant contends that the trial court improperly concluded that the hearing officer's finding of chronicity was not supported by the record because there was ample evidence of other incidents of abuse by the plaintiff. The defendant therefore contends that the trial court should not have remanded the case because the record supported the ultimate finding that the plaintiff poses a risk to the well-being of children to warrant placement of his name on the registry. In response, the plaintiff contends that the trial court properly concluded that there was no evidence of other incidents of abuse, but should have sustained his appeal rather than remanded the case to the defendant. Although the plaintiff does not challenge the trial court's conclusion that the record supported the hearing officer's finding that the plaintiff was responsible for physical abuse to Felix, he claims that, in the absence of evidence of chronicity, there was insufficient evidence that he poses a risk to the well-being of children. We agree with the defendant.

At the outset, it is important to underscore that the scope of judicial review of an administrative agency's

decision under § 4-183 "is very restricted." (Internal quotation marks omitted.) *Jim's Auto Body* v. *Commissioner of Motor Vehicles*, 285 Conn. 794, 803, 942 A.2d 305 (2008). "[R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Citations omitted; internal quotation marks omitted.) *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 833, 955 A.2d 15 (2008). "Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) Id.

The hearing officer found that the episode with Felix was not an isolated incident because there had been "a pattern of behavior by the [plaintiff] to induce compliance on his unit" such that "[o]ther detainees feared for their own safety as a result of the [plaintiff's] conduct." This fact had to be found only by a preponderance of the evidence. Id., 821. The hearing officer did not indicate which incidents had formed the basis of this finding or what evidence had been credited. The record, however, reflects the following evidence, which the plaintiff does not challenge. The defendant offered a special investigation report regarding abuse allegations at the detention center, prepared by the defendant's investigator, Wendy L. Bonola, which was supported by narratives of Bonola's interviews with detainees and detention center staff and by Bonola's

testimony. Among the complaints that Bonola found credible were allegations that the plaintiff had threatened to put detainees in a room with other detainees to be assaulted when they were not behaving, that the plaintiff had watched passively as detainees assaulted each other, that the plaintiff had threatened to assault detainees personally when they misbehaved and had threatened to assault them personally if they reported mistreatment.[9] The fact that such conduct could have

---

[9] Bonola's report set forth the following supportive findings: "[Detainee], Edward [B.], stated that [the plaintiff] will frequently threaten children in the [detention center] that if they do not act correctly, they will go to room M4. Edward indicated that on one occasion [the plaintiff] put him in room M4 after he was acting out and closed the door. Edward stated that a physical altercation occurred between him and the other [detainee in room M4] for approximately [three] minutes. [The plaintiff] opened the door and watched them continue to fight until Edward stated [that] he was tired and could not defend himself any longer. . . .

"[Detainee], Michael [S.], stated that he had an altercation with [the plaintiff] because he would not pick up a trash can. Michael indicated that [the plaintiff] 'grabbed [him] and threw him to the ground' after telling the child twice to pick up the can. Michael stated he was then grabbed by the upper arms from behind and 'clipped.' The term 'clipped' means that [the plaintiff]] put his foot in between the child's and pushed his shoulder causing him to fall [forward]. . . .

"[Detainee], John [M.], stated that he saw [the plaintiff] throw Michael [S.] to the ground after he cursed at staff. [The plaintiff] then picked [Michael] up by the shirt, threw him on the ground and twisted his arm. [The plaintiff] yelled at Michael 'you will respect me.' Michael said he would not and was crying. John stated that he heard [the plaintiff] tell [Michael] that 'I don't care, I'll break your arm if I have to.' . . .

"Employee, Laurie Nordstrom, stated that she was told by [a detainee], John [R.], that [the plaintiff] told him that he would be put into [another detainee's] room if he did not stop banging. John's interpretation of this was that he would be put into the room to be physically assaulted by another [detainee] if he did not behave. . . .

"Employee, Joseph Murdo, stated that he heard [the plaintiff] say to [detainee], Mike [R.], 'If you press charges, I'll kick your ass.' This was stated after Mike complained about the way he was treated during a restraint. . . .

"[Detainee], Jameera [M.], stated that [the plaintiff] is slow to intervene when youth are fighting and specifically stood back and watched when Marie [P.] and another [detainee] recently had a physical alteration."

Narratives of Bonola's interviews also indicated that a female detainee at the detention center had reported that the plaintiff placed her in a room

occurred at the detention center was supported by the fact that thirteen detention center employees had indicated in their interviews "that they have knowledge [that detainees] may be used to physically discipline other [detainees] who misbehave." Bonola testified that one supervisor had told her that tougher detainees reported to him that they were being placed in other detainees' rooms as enforcers and that this supervisor had expressed a concern that this was happening during a particular shift, which was the shift that the plaintiff supervised.

The defendant's report also contained numerous allegations of conduct by the plaintiff toward female detain-

---

with two other detainees with whom she clearly did not get along, and that the plaintiff stated that he had done so because the detainee had "blown" her alternative detention placement. A former detainee also reported that the plaintiff would "put girls together who have [a] 'beef' " and that the plaintiff and another staff member would let detainees fight for awhile without intervening if they did not like a particular detainee. Another detainee alleged that he "was scared of a kid in his room who was making sexual advances and [the plaintiff] denied the room change. [The plaintiff] is the one that put him in that room as punishment as he said, 'See how you like this gay kid.' "

Bonola testified: "Edward [B.] basically told me that [the plaintiff] . . . threatens children frequently at [the detention center]. He recollected an incident where [the plaintiff] had threatened to put a child—have him go to a child's room for what he understood was an alleged beatdown, if you want to call it that, or an enforcement situation . . . . Basically . . . he was concerned about [the plaintiff's] treatment of the kids and the fact that he threatens them, he was frightened, and that there was a situation again of putting another youth in another youth's room for—to be physically assaulted."

Bonola also testified that Nordstrom had recounted to her an incident in which the head of the detention center had asked Nordstrom to interview John R. after John made allegations against the plaintiff. Nordstrom had told Bonola that John "told [Nordstrom and the head of the detention center] that he was going to be placed [by the plaintiff] in a room with another child for the purpose of being beat up because he was excessively banging, and that [the plaintiff] had told him that it was going to happen so that he'd stop excessively banging." Bonola's written narrative of the interview with Nordstrom further reflected that Nordstrom had stated that John "started crying and stated that he didn't feel safe and wanted to be transferred."

ees that generally can be characterized as degrading and emotionally abusive. Although these allegations do not provide direct support for the hearing officer's finding that the plaintiff had engaged in coercive conduct that caused detainees to fear for their safety, the hearing officer reasonably may have relied on those allegations to the extent that they might bear on the plaintiff's attitude and behavior toward the detainees. See *Salmon* v. *Dept. of Public Health & Addiction Services*, 259 Conn. 288, 319, 788 A.2d 1199 (2002) ("rules of evidence do not apply in administrative hearings"). Indeed, the Second Circuit Court of Appeals, in affirming the District Court's decision granting summary judgment in the defendant's favor in the plaintiff's challenge to his termination, noted: "There is overwhelming credible evidence in official reports and statements, including a report by the [defendant], that [the plaintiff] physically abused and neglected juvenile detainees." *Hogan* v. *Judicial Branch*, 64 Fed. Appx. 256, 258 (2d Cir. 2003).

In sum, the record supported the hearing officer's finding that the episode with Felix was not an isolated incident. The trial court rejected this finding for two reasons, both of which we reject. First, the court assumed that the sole basis for the hearing officer's finding was the defendant's interview with two detainees, Edward B. and John R.; see footnote 9 of this opinion; and concluded that the testimony from Bonola simply "relates the children's 'understanding' that [the plaintiff] had stated his intent of placing one detainee in a room with another." Our review of the transcript of Bonola's testimony and the report in its entirety supports the hearing officer's conclusion that the plaintiff's threats to these two detainees was not meant to convey the innocuous act of placing detainees in a room together with no intended adverse consequences. There was abundant evidence that detention officers clearly had communicated that a threat to place detainees in

a room together was an implicit threat of, as one shift supervisor described to Bonola, "what is commonly referred to as a beatdown . . . ." The plaintiff's conduct with respect to Felix reasonably supports the inference that the plaintiff's threats to place detainees in a room together was intended to convey that message. Indeed, Bonola testified that John's request to transfer to another facility was granted after he expressed fear to detention center officials about the plaintiff's threat, an action that would indicate that such a fear was deemed sufficiently credible.

Second, the trial court noted that the arbitrator who had sustained the plaintiff's termination on the basis of the incident with Felix had not found that there were additional incidents. The arbitrator did not find expressly, however, that the plaintiff had *not* engaged in other acts that had caused detainees to fear for their safety. Rather, he found that the incident with Felix provided a sufficient basis to sustain the plaintiff's termination. The arbitrator did find expressly that the defendant had met all the elements necessary to prove just cause to terminate the plaintiff, one of which relates to whether the degree of discipline was reasonably related to the seriousness of the plaintiff's past offense *and the plaintiff's past record.* To the extent that the arbitrator opined that the plaintiff is not a "monster," that he "sincerely cared about the children in his care," that frustration had caused the plaintiff to "behave in a manner that was out of character," and that the plaintiff simply has too low a threshold for dealing with a population that has a "peculiar capacity to frequently push the patience of the average person beyond toleration," the hearing officer was not required to adopt the arbitrator's dicta or view of the evidence. Cf. *LaSalla* v. *Doctor's Associates, Inc.*, 278 Conn. 578, 586–94, 898 A.2d 803 (2006) (issue and claim preclusion inapplicable to subsequent arbitration proceeding between same par-

ties). Therefore, the trial court improperly concluded that the hearing officer's finding that the chronicity factor had been satisfied was not supported by substantial evidence. Accordingly, the trial court improperly remanded the case for a new determination as to whether the plaintiff's name should be placed on the registry.

Turning to the question of whether the hearing officer properly found that the plaintiff's name should be placed on the registry because he poses a risk to the health, safety or well-being of children, we again note the following factors that the hearing officer weighed: the plaintiff's intent, the severity of the incident, the chronicity of the plaintiff's behavior and whether excessive force had been used. In addition to the chronicity evidence we previously have discussed, the evidence supports the conclusion that the plaintiff intended for Michael to assault Felix to coerce his silence and that Felix could have sustained more serious injuries given the size of his much larger opponent and the absence of any supervision at the time of the assault. The evidence further indicates that the plaintiff repeatedly refused to acknowledge the wrongfulness of his conduct, proffering a story that neither the arbitrator nor the hearing officer credited, namely, that the plaintiff had sent Michael into the room only to "counsel" Felix. In abuse and neglect cases, it is well established that the failure to accept responsibility reasonably may be considered as an indication that there is a risk that the abuse will continue. Cf. *In re Allison G.*, 276 Conn. 146, 161, 883 A.2d 1226 (2005); *In re David W.*, 254 Conn. 676, 682, 691, 759 A.2d 89 (2000); *In re Vanna A.*, 83 Conn. App. 17, 19, 847 A.2d 1073 (2004); see also *State* v. *Barnes*, 33 Conn. App. 603, 610, 637 A.2d 398 (1994) ("the sentencing judge properly related the defendant's refusal to admit responsibility and claims of innocence to the likelihood of his rehabilitation"), aff'd, 232 Conn. 740,

657 A.2d 611 (1995). Moreover, although Felix undoubtedly had engaged in behavior that would have tested and exceeded the patience of the average person, as any person whose profession requires direct contact with children or adolescents can attest, it is not unusual to encounter situations that require a heightened threshold for such recalcitrance. Accordingly, we conclude that the hearing officer's finding that the plaintiff poses a risk to the safety or well-being of children such that it was appropriate to place his name on the registry was supported by the evidence.

## III

We therefore turn to the plaintiff's constitutional challenges to the registry scheme.[10] The plaintiff contends that the registry scheme: (1) violates the doctrine of separation of powers because the legislature improperly failed to set forth intelligible principles to guide the defendant's registry decisions and improperly delegated judicial authority to the defendant; (2) violates due process because it is vague and overbroad; and (3) constitutes a bill of attainder. Although the plaintiff asserts that the scheme violates both the state and federal constitutions, he has failed to provide the analysis set forth in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), that is a prerequisite to asserting an independent claim under the state constitution.[11] *Asel-*

[10] The plaintiff frames his constitutional challenges in reference to P.A. 05-207 generally. That act amended various statutes that refer to the registry, most significantly for purposes of this appeal, General Statutes §§ 17a-101g and 17a-101k. For purposes of clarity, we refer to his challenges as ones to the registry scheme.

[11] The plaintiff does assert a claim that the registry scheme violates the doctrine of separation of powers specifically under articles second and fifth of the Connecticut constitution by improperly delegating exclusive judicial power to the defendant. Although the plaintiff seeks review of this unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), and our inherent supervisory authority, the sum of the plaintiff's argument appears to be predicated on his assertion that the registry inflicts a form of punishment. The plaintiff has not indicated how our analysis of whether the registry inflicts "punishment" for purposes of his bill of attainder claim

*ton* v. *East Hartford*, 277 Conn. 120, 153, 890 A.2d 1250 (2006). We therefore limit our analysis to the dictates of the federal constitution, and we conclude that the plaintiff's constitutional challenges lack merit.

Because this case presents the first occasion that this court has had to examine the registry scheme in a meaningful way, we briefly note by way of background the following information. The registry scheme is codified in two sections that work in tandem: General Statutes §§ 17a-101g[12] and 17a-101k. Section 17a-101g sets

should differ from our analysis of this claim. Accordingly, we conclude that our resolution of the plaintiff's bill of attainder claim in part III C of this opinion, also predicated on separation of powers concerns, disposes of this claim.

[12] General Statutes § 17a-101g provides in relevant part: "(a) Upon receiving a report of child abuse or neglect, as provided in sections 17a-101a to 17a-101c, inclusive, or section 17a-103, in which the alleged perpetrator is (1) a person responsible for such child's health, welfare or care, (2) a person given access to such child by such responsible person, or (3) a person entrusted with the care of a child, the Commissioner of Children and Families, or the commissioner's designee, shall cause the report to be classified and evaluated immediately. If the report contains sufficient information to warrant an investigation, the commissioner shall make the commissioner's best efforts to commence an investigation of a report concerning an imminent risk of physical harm to a child or other emergency within two hours of receipt of the report and shall commence an investigation of all other reports within seventy-two hours of receipt of the report. The department shall complete any such investigation not later than forty-five calendar days after the date of receipt of the report. If the report is a report of child abuse or neglect in which the alleged perpetrator is not a person specified in subdivision (1), (2) or (3) of this subsection, the Commissioner of Children and Families shall refer the report to the appropriate local law enforcement authority for the town in which the child resides or in which the alleged abuse or neglect occurred.

"(b) The investigation shall include a home visit at which the child and any siblings are observed, if appropriate, a determination of the nature, extent and cause or causes of the reported abuse or neglect, a determination of the person or persons suspected to be responsible for such abuse or neglect, the name, age and condition of other children residing in the same household and an evaluation of the parents and the home. The report of such investigation shall be in writing. The investigation shall also include, but not be limited to, a review of criminal conviction information concerning the person or persons alleged to be responsible for such abuse or neglect and previous allegations of abuse or neglect relating to the child or other

forth the defendant's responsibilities upon receiving a report of abuse or neglect of a child: classification; evaluation; investigation; and determination of whether abuse or neglect has occurred. General Statutes § 17a-101g (a) and (b). The statute directs that, "[i]f the com-

children residing in the household or relating to family violence. After an investigation into a report of abuse or neglect has been completed, the commissioner shall determine, based upon a standard of reasonable cause, whether a child has been abused or neglected, as defined in section 46b-120. If the commissioner determines that abuse or neglect has occurred, the commissioner shall also determine whether: (1) There is an identifiable person responsible for such abuse or neglect; and (2) such identifiable person poses a risk to the health, safety or well-being of children and should be recommended by the commissioner for placement on the child abuse and neglect registry established pursuant to section 17a-101k. If the commissioner has made the determinations in subdivisions (1) and (2) of this subsection, the commissioner shall issue notice of a recommended finding to the person suspected to be responsible for such abuse or neglect in accordance with section 17a-101k.

"(c) Except as provided in subsection (d) of this section, no entry of the recommended finding shall be made on the child abuse or neglect registry and no information concerning the finding shall be disclosed by the commissioner pursuant to a check of the child abuse or neglect registry or request for information by a public or private entity for employment, licensure, or reimbursement for child care purposes pursuant to programs administered by the Department of Social Services or pursuant to any other general statute that requires a check of the child abuse or neglect registry until the exhaustion or waiver of all administrative appeals available to the person suspected to be responsible for the abuse or neglect, as provided in section 17a-101k.

"(d) If the child abuse or neglect resulted in or involves (1) the death of a child; (2) the risk of serious physical injury or emotional harm of a child; (3) the serious physical harm of a child; (4) the arrest of a person due to abuse or neglect of a child; (5) a petition filed by the commissioner pursuant to section 17a-112 or 46b-129; or (6) sexual abuse of a child, entry of the recommended finding may be made on the child abuse or neglect registry and information concerning the finding may be disclosed by the commissioner pursuant to a check of the child abuse or neglect registry or request for information by a public or private entity for employment, licensure, or reimbursement for child care purposes pursuant to programs administered by the Department of Social Services or pursuant to any other general statute that requires a check of the child abuse or neglect registry, prior to the exhaustion or waiver of all administrative appeals available to the person suspected to be responsible for the abuse or neglect as provided in section 17a-101k. . . ."

missioner [of children and families (commissioner)] determines that abuse or neglect has occurred, the commissioner shall also determine whether: (1) [t]here is an identifiable person responsible for such abuse or neglect; and (2) such identifiable person poses a risk to the health, safety or well-being of children and should be recommended by the commissioner for placement on the child abuse and neglect registry established pursuant to section 17a-101k." General Statutes § 17a-101g (b). The defendant is directed under § 17a-101k (i) to adopt regulations to implement the provision of that statute.

If the commissioner determines that a person should be listed on the registry, that information is confidential, except where authorized specifically by statute or regulation, and unlawful disclosure is a criminal offense. General Statutes § 17a-101k (a). Statutes that authorize disclosure are limited to specific governmental agencies or persons directly involved with child protection and agencies that license persons providing child care services or that employ persons charged with child protection, such as the defendant, the department of public health and the department of social services. See General Statutes §§ 17a-6a, 17a-28 (f), 17a-114 (b) (2), 17b-749k (a), 19a-77a (a) (8), 19a-80 (c), 19a-87b (b); see also General Statutes § 17a-101i (a) (addressing notice requirements upon defendant's finding of child abuse by school employee to school officials). These confidentiality parameters conform with those set forth under federal law to qualify states for federal grants for child abuse and neglect prevention and treatment programs. See *Groton Police Dept.* v. *Freedom of Information Commission*, 104 Conn. App. 150, 162–63, 931 A.2d 989 (2007). Mindful of the potential effect of such disclosures, § 17a-101k (b) (3) provides in relevant part: "Upon the issuance of a recommended finding that an individual is responsible for abuse or neglect of a child

pursuant to subsection (b) of section 17a-101g, the commissioner shall provide notice of the finding . . . to the individual who is alleged to be responsible for the abuse or neglect. The notice shall . . . [i]nform the individual of the potential adverse consequences of being listed on the registry, including, but not limited to, the potential effect on the individual obtaining or retaining employment, licensure or engaging in activities involving direct contact with children and inform the individual of the individual's right to administrative procedures as provided in this section to appeal the finding . . . ." With this background in mind, we turn to the plaintiff's constitutional challenges to the registry scheme.

## A

The plaintiff raises two claims that charge that the registry scheme is vague: one focuses exclusively on the statutory scheme and the other requires us to broaden our lens to consider also the regulatory scheme and related case law. We therefore begin with the narrower focus, namely, the plaintiff's contention that the registry scheme violates the constitutional guarantee of separation of powers because the scheme constitutes an improper delegation of legislative power to the defendant. Specifically, the plaintiff asserts that the registry scheme authorizes the defendant to adopt regulations to implement the scheme without setting forth intelligible principles to guide the defendant as to what type or degree of abuse or neglect would warrant placement of a person's name on the registry. We disagree that the scheme lacks sufficient direction to the defendant.

The following principles are well settled. "The [c]onstitution of this state provides for the separation of the governmental functions into three basic departments, legislative, executive and judicial, and it is inherent in

this separation, since the law-making function is vested exclusively in the legislative department, that the [l]egislature cannot delegate the law-making power to any other department or agency. . . . A [l]egislature, in creating a law complete in itself and designed to accomplish a particular purpose, may expressly authorize an administrative agency to fill up the details by prescribing rules and regulations for the operation and enforcement of the law. In order to render admissible such delegation of legislative power, however, it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out, or lay down an intelligible principle to which the administrative officer or body must conform, with a proper regard for the protection of the public interests and with such degree of certainty as the nature of the case permits, and enjoin a procedure under which, by appeal or otherwise, both public interests and private rights shall have due consideration. . . . If the [l]egislature fails to prescribe with reasonable clarity the limits of the power delegated or if those limits are too broad, its attempt to delegate is a nullity." (Citations omitted.) *State* v. *Stoddard*, 126 Conn. 623, 627–28, 13 A.2d 586 (1940).

"In delegating authority to an administrative board [however] the legislature cannot know or foresee all the possibilities that might arise." (Internal quotation marks omitted.) *Wilson Point Property Owners Assn.* v. *Connecticut Light & Power Co.*, 145 Conn. 243, 267, 140 A.2d 874 (1958). "The test for constitutionally sufficient standards to govern the exercise of delegated powers requires only that the standards be as definit[e] as is reasonably practicable under the circumstances." (Internal quotation marks omitted.) *State* v. *Campbell*, 224 Conn. 168, 180, 617 A.2d 889 (1992), cert. denied, 508 U.S. 919, 113 S. Ct. 2365, 124 L. Ed. 2d 271 (1993).

In the present case, the legislature's stated purpose in requiring the defendant to maintain the registry is

"to prevent or discover abuse of children . . . ." General Statutes § 17a-101k (a). The predicate to consideration for placement of one's name on the registry is a "finding that an individual is responsible for abuse or neglect of a child pursuant to subsection (b) of section 17a-101g . . . ." General Statutes § 17a-101k (b). Section 17a-101g (b) in turn requires the defendant, when conducting an investigation into allegations of abuse or neglect, to consider factors including, but not limited to, "a determination of the nature, extent and cause or causes of the reported abuse or neglect . . . . After an investigation into a report of abuse or neglect has been completed, the commissioner shall determine, based upon a standard of reasonable cause, whether a child has been abused or neglected, as defined in [General Statutes §] 46b-120.[13] If the commissioner determines that abuse or neglect has occurred, the commissioner shall also determine whether: (1) [t]here is an identifiable person responsible for such abuse or neglect; and (2) such identifiable person *poses a risk to the health, safety or well-being of children* and should be recommended by the commissioner for placement on the child abuse and neglect registry established pursuant to section 17a-101k. . . ." (Emphasis added.) Certain findings of abuse may result in the placement of an abuser's name on the registry even prior to exhaustion of administrative remedies: "[i]f the child abuse or

---

[13] General Statutes § 46b-120 provides in relevant part: "(4) '[A]bused' means that a child or youth (A) has been inflicted with physical injury or injuries other than by accidental means, or (B) has injuries that are at variance with the history given of them, or (C) is in a condition that is the result of maltreatment such as, but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment . . . (9) a child or youth may be found 'neglected' who (A) has been abandoned, or (B) is being denied proper care and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth, or (D) has been abused . . . ."

neglect resulted in or involves (1) the death of a child; (2) the risk of serious physical injury or emotional harm of a child; (3) the serious physical harm of a child; (4) the arrest of a person due to abuse or neglect of a child; (5) a petition filed by the commissioner pursuant to section 17a-112 or 46b-129; or (6) sexual abuse of a child . . . ." General Statutes § 17-101g (d).

These parameters are sufficiently clear to guide the defendant in light of the aim of the legislation. The defendant must consider the nature, extent and cause of the abuse or neglect—terms defined by statute—to determine whether the person responsible for the abuse poses a risk to the health, safety or well-being of children. This undoubtedly is a predictive exercise. As we previously have recognized, "the legislative process would frequently bog down if the General Assembly were constitutionally required to appraise beforehand the myriad situations to which it wishes a particular policy to be applied . . . . To require any more specificity in the standards . . . would hamper the flexibility needed for the [defendant] to [carry out its duties]." (Citations omitted; internal quotation marks omitted.) *University of Connecticut Chapter, AAUP* v. *Governor*, 200 Conn. 386, 398–99, 512 A.2d 152 (1986). Accordingly, the registry scheme does not constitute an unlawful delegation of legislative power.[14]

B

We next turn to the plaintiff's claim that the registry scheme violates due process because it is vague and

---

[14] The plaintiff also has asserted a claim that "[t]he legislature also has failed to establish an independent administrative organ tasked with making independent administrative adjudication to fairly guide the [defendant] when placing persons on the [registry]." We decline to address this issue because the plaintiff: (1) has raised it for the first time on appeal without invoking any relevant doctrine to avoid the preservation requirement; see *State* v. *Ramos*, 261 Conn. 156, 171, 801 A.2d 788 (2002); and (2) has failed to brief it adequately for our review. See *Taylor* v. *Mucci*, 288 Conn. 379, 383 n.4, 952 A.2d 776 (2008).

overbroad. The plaintiff does not point to specific language that is vague, but, rather, contends that the scheme generally fails to provide fair notice of what conduct will expose a person to the registry requirement. The plaintiff also contends that the scheme is deficient because it fails to provide an individualized assessment of the risk to the community posed by each person on the registry, citing *Doe* v. *Dept. of Public Safety*, 271 F.3d 38, 61 (2d Cir. 2001), rev'd, 538 U.S. 1, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003). We disagree.

"The purpose of the vagueness doctrine is twofold. The doctrine requires statutes to provide fair notice of the conduct to which they pertain and to establish minimum guidelines to govern law enforcement." (Internal quotation marks omitted.) *Gonzalez* v. *Surgeon*, 284 Conn. 573, 583–84, 937 A.2d 24 (2007). "Because perfect precision is neither possible nor required . . . the [vagueness] doctrine does not mandate the invalidation of all imprecisely drafted [statutes]. . . . References to judicial opinions involving the [statute], the common law, legal dictionaries, or treatises may be necessary to ascertain a [statute's] meaning to determine if it gives fair warning." (Citation omitted; internal quotation marks omitted.) *Thalheim* v. *Greenwich*, 256 Conn. 628, 641, 775 A.2d 947 (2001).

"[T]he degree of vagueness that the [c]onstitution tolerates . . . depends in part on the nature of the enactment. . . . The [United States Supreme Court] has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." (Internal quotation marks omitted.) *Gonzalez* v. *Surgeon*, supra, 284 Conn. 584. Therefore, "[c]ivil statutes . . . may survive a vagueness challenge by a lesser degree of specificity than in criminal statutes." *State Management Assn. of Connecticut, Inc.* v. *O'Neill*, 204 Conn. 746, 757, 529 A.2d 1276 (1987).

In addition to the statutory standards discussed in part III A of this opinion, § 17a-101k (i) directed the defendant to adopt regulations to implement the registry provisions of the statute. At the time of the administrative proceedings in this case, however, draft regulations were still under review.[15] To fill the gap while those regulations were pending, the defendant was guided by criteria set forth in its policy manual.[16] Those criteria included specific circumstances under which a perpetrator of abuse shall be included on the registry.[17] For all other circumstances in which the defendant has substantiated an allegation of abuse or neglect, the manual directs the hearing officer to "review the case for a determination of whether the perpetrator poses a risk to the health, safety and well-being of children and should be recommended for placement on the [registry]" on the basis of the following

[15] According to documents submitted by the defendant to this court, the defendant approved final regulations on October 28, 2008.

[16] Although the plaintiff points out that this policy manual did not undergo the formal procedures required for binding regulations, his analysis considers it as part of the relevant scheme, as did the trial court. In light of this fact and the fact that it appears that the policy manual was published, we consider the policy manual in determining whether the plaintiff had fair notice of the possibility that his name could be placed on the registry.

[17] The policy manual provided in relevant part: "The identified perpetrator shall be recommended by investigations staff for placement on the [r]egistry, and shall be confirmed by the [h]earings [o]fficer for placement on the [r]egistry when

"the substantiation is for sexual abuse and the perpetrator is over sixteen (16) years of age

"there is a second substantiation for physical or emotional abuse

"the perpetrator of physical or emotional abuse is likely to have ongoing parent/guardian/caretaker [responsibility] or [is a] person entrusted responsibility for the victim and an assessment of risk indicates a moderate to high risk of recurrence of . . . maltreatment of the victim

"the perpetrator of physical or emotional abuse is a person entrusted with the care of a child as defined in the operational definitions

"the perpetrator is arrested for the act of abuse or neglect that is substantiated

"the department files a petition for neglect or termination of parental rights pursuant to [General Statutes] §§ 46b-129 or 17a-112, respectively . . . ."

factors, including, "the intent of the perpetrator, the severity of the impact and the chronicity of the perpetator's conduct . . . ." The manual lists questions relevant to those factors that are specific to sexual abuse, physical abuse and neglect. In addition to the manual and statutes, there is, of course, a well developed body of case law addressing parameters for findings of abuse and neglect, as well as cases addressing circumstances when the defendant may act prophylactically. See, e.g., *In re Stephen M.*, 109 Conn. App. 644, 651 and n.11, 953 A.2d 668 (2008) (citing "doctrine of predictive neglect"); *In re T.K.*, 105 Conn. App. 502, 513, 939 A.2d 9 ("[t]he doctrine of predictive neglect is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred"), cert. denied, 286 Conn. 914, 945 A.2d 976 (2008); *In re Michael D.*, 58 Conn. App. 119, 123, 752 A.2d 1135 ("[o]ur statutes clearly permit an adjudication of neglect based on a potential for harm or abuse to occur in the future"), cert. denied, 254 Conn. 911, 759 A.2d 505 (2000).

We conclude that the statutory provisions discussed in part III A of this opinion, the manual and case law provide sufficient specificity to give fair notice and to preclude arbitrary enforcement. To require the defendant to delineate every act that would lead to placement of a person's name on the registry would be impracticable when the issue is a prediction of risk. See *State* v. *Anonymous*, 179 Conn. 155, 165, 425 A.2d 939 (1979) (rejecting vagueness challenge to "best interests of the child" standard in parental termination case, reasoning that "[s]tandards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment" [internal quotation marks omitted]); see also *Piscottano* v. *Murphy*, 511 F.3d 247, 280 (2d Cir. 2007) ("a regulation need not achieve 'meticulous specificity,' which would come at the cost of 'flexibility and reasonable breadth' ").

Finally, we note that the plaintiff has made the cursory assertion that the registry scheme is overbroad, but has provided no analysis independent of his vagueness claim. See *State* v. *DeLoreto*, 265 Conn. 145, 166, 827 A.2d 671 (2003) ("[a]lthough the doctrines of overbreadth and vagueness are closely related . . . they are distinct" [internal quotation marks omitted]). He also has failed to make clear how the decision of the Court of Appeals for the Second Circuit in *Doe* v. *Dept. of Public Safety*, supra, 271 F.3d 38, bears on his claim. That case addressed whether the statutory scheme commonly known as Megan's Law, which requires persons convicted of sex offenses to register with the department of public safety and mandates disclosure of that registry to the public, violates procedural due process and constitutes an ex post facto law. Id., 41. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Taylor* v. *Mucci*, 288 Conn. 379, 383 n.4, 952 A.2d 776 (2008).

C

Finally, we consider whether the registry scheme constitutes a bill of attainder in violation of article one, § 10, of the federal constitution.[18] "Bills of attainder are 'legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial . . . .' *United States* v. *Lovett*, 328 U.S. 303, 315, 66 S. Ct. 1073, 90 L. Ed. 1252 (1946)." *Morris* v. *Congdon*, 277 Conn. 565, 578, 893 A.2d 413 (2006). The bill of attainder clause

---

[18] Article one, § 10, of the constitution of the United States provides in relevant part: "No State shall . . . pass any Bill of Attainder . . . ."

was intended to implement the separation of powers, acting as "a general safeguard against legislative exercise of the judicial function . . . ." *United States* v. *Brown*, 381 U.S. 437, 442, 85 S. Ct. 1707, 14 L. Ed. 2d 484 (1965). A bill of attainder has "three requirements, i.e., specification of the affected persons, punishment, and lack of a judicial trial." *Selective Service System* v. *Minnesota Public Interest Research Group*, 468 U.S. 841, 847, 104 S. Ct. 3348, 82 L. Ed. 2d 632 (1984).

The plaintiff contends that the registry scheme is a bill of attainder because: it applies to easily ascertainable members of a group—persons deemed child abusers by the defendant; it inflicts punishment—the potential loss of employment; and it does so without providing a judicial trial—there is no judicial mechanism to determine whether a person has committed a wrongful act or the particular level of risk posed. We conclude that, even if we were to assume that the scheme satisfies the first and third requirements of a bill of attainder, it does not meet the second.

"[T]he [Supreme] Court [has] applied three tests to determine whether legislative punishment of the type contemplated by the [b]ill of [a]ttainder [c]lauses was imposed: [1] the historical test, involving punishment traditionally judged to be prohibited by the [b]ill of [a]ttainder [c]lause, *Nixon* v. *Administrator of [General Services]*, 433 U.S. 425, 475, 97 S. Ct. 2777, 2806, 53 L. Ed. 2d 867 (1977), including death, imprisonment, banishment, punitive confiscation of property by the sovereign and, in more recent times, laws barring designated individuals or groups from participation in specified employments or vocations, id. [474]; [2] the functional test, which analyz[es] whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes, id. [475–76]; and [3] the motivational test, which inquire[s] whether the leg-

islative record evinces a congressional intent to punish, id. [478]." (Internal quotation marks omitted.) *In the Matter of the Request for Extradition of McMullen,* 989 F.2d 603, 607 (2d Cir.), cert. denied sub nom. *McMullen v. United States,* 510 U.S. 913, 114 S. Ct. 301, 126 L. Ed. 2d 249 (1993).

The registry scheme does not meet any of these tests for legislative punishment. The scheme does not ban persons listed on the registry from employment in any field, and therefore cannot be deemed to constitute historical punishment.[19] Cf. *United States* v. *Brown,* supra, 381 U.S. 458–61 (denying labor union employment in all but clerical or custodial positions to members of Communist party constituted punishment); *United States* v. *Lovett,* supra, 328 U.S. 316–18 (barring named individuals from government employment without judicial trial constituted punishment); *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 374–81, 18 L. Ed. 366 (1867) (prohibiting any person from practicing law who would not swear under oath that he had not supported Confederacy constituted punishment); *Cummings* v. *Missouri,* 71 U.S. (4 Wall.) 277, 332, 18 L. Ed. 356 (1867) (barring clergymen from ministry in absence of subscribing to loyalty oath constituted punishment).

Turning to the functional test, although the registry scheme acknowledges that a potential effect of placement of a person's name on the registry could be impairment of certain employment opportunities; General

---

[19] We note that several courts have interpreted the United States Supreme Court cases on employment bans more contextually and have concluded that an express ban on employment in a specified profession would not necessarily make a law a bill of attainder when the ban seeks to achieve a legitimate end and a nonpunitive purpose. See, e.g., *BellSouth Corp.* v. *Federal Communications Commission,* 162 F.3d 678, 688 (D.C. Cir. 1998); *Dehainaut* v. *Pena,* 32 F.3d 1066, 1071–72 (7th Cir. 1994), cert. denied, 514 U.S. 1050, 115 S. Ct. 1427, 131 L. Ed. 2d 309 (1995); *Zwick* v. *Freeman,* 373 F.2d 110, 119–20 (2d Cir.), cert. denied, 389 U.S. 835, 88 S. Ct. 43, 19 L. Ed. 2d 96 (1967).

Statutes § 17a-101k (b) (3); the stated purpose of the registry is "to prevent or discover abuse of children . . . ." General Statutes § 17a-101k (a). The limited disclosure permitted under the scheme is to agencies overseeing employment opportunities involving direct contact with children. The absence of the potential to cause abuse or neglect to children undoubtedly would constitute a legitimate qualification for such employment. See *De Veau* v. *Braisted*, 363 U.S. 144, 160, 80 S. Ct. 1146, 4 L. Ed. 2d 1109 (1960) ("[t]he question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession"); *Hawker* v. *New York*, 170 U.S. 189, 18 S. Ct. 573, 42 L. Ed. 1002 (1898) (precluding convicted felon from practicing medicine not bill of attainder when relevant to qualification for profession). Thus, the burden imposed undoubtedly furthers the nonpunitive purpose of protecting children.

Finally, the legislative record reflects that the legislature's sole motivation in enacting the registry was to ensure that children were protected from the risk of harm. Indeed, the isolated references in the legislative record to the effect of the disclosure on the abuser indicates concerns that the disclosure should accurately reflect the facts, be limited to the extent necessary to protect children and occur only after procedural due process had been afforded to the alleged abuser. See 39 S. Proc., Pt. 6, 1996 Sess., pp. 1942–43; 48 H.R. Proc., Pt. 20, 2005 Sess., pp. 6075–79.

The fact that this registry scheme does not inflict punishment also is confirmed by case law holding that publicly available sex offender registries, which undoubtedly have more far reaching consequences than

the registry at issue in the present case, are not punitive. See *Smith* v. *Doe*, 538 U.S. 84, 103, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003) (Alaska's sex offender registry not punishment under functional or motivational test for purposes of ex post facto claim); *State* v. *Arthur H.*, 288 Conn. 582, 590, 953 A.2d 630 (2008) ("[Connecticut's] requirement to register as a sex offender is regulatory, rather than punitive, in nature"). Accordingly, because the registry scheme does not inflict punishment, it does not constitute a bill of attainder.

In sum, the trial court properly rejected the plaintiff's constitutional challenges to the registry scheme. The court improperly remanded the case to the hearing officer for reconsideration of its registry decision, however, because the record supported the hearing officer's finding that the incident with Felix was not an isolated incident and, in turn, supported the decision to place the plaintiff's name on the registry.

The judgment is reversed in part with respect to the trial court's order remanding the case to the defendant, and the case is remanded to that court with direction to affirm the defendant's decision.

In this opinion the other justices concurred.