******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

KRISTINE CASEY ET AL. *v.* GOVERNOR
NED LAMONT
(SC 20494)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Pursuant to statute (§ 28-9 (a)), "[i]n the event of serious disaster . . . the Governor may proclaim that a state of civil preparedness emergency exists . . . ."

The plaintiffs, the owners of a pub located in Connecticut, sought relief in connection with the issuance of certain executive orders by the defendant, the governor of the state of Connecticut, amid the COVID-19 pandemic. In response to the pandemic, the governor proclaimed a civil preparedness emergency pursuant to § 28-9 (a) and issued the challenged executive orders in an attempt to contain and mitigate the spread of COVID-19, including orders that limited various activities at bars and restaurants throughout the state. The plaintiffs closed their pub after determining that it would not be profitable to operate the pub while complying with the executive orders. The plaintiffs sought an injunction precluding the enforcement of the executive orders and a judgment declaring the orders unconstitutional. The trial court denied the plaintiffs' requests for relief and rendered judgment for the governor. The plaintiffs appealed to this court upon certification by the Chief Justice pursuant to statute (§ 52-265a) that a matter of substantial public interest was involved. *Held*:

1. The governor did not exceed his statutory authority when he issued the challenged executive orders: on the basis of the text and legislative history of both § 28-9 (a) and another related statute (§ 28-1 (2)) that refers to civil preparedness emergencies under § 28-9 and that defines the term "major disaster," as well as a declaration by the president of the United States that the COVID-19 pandemic was of sufficient severity and magnitude to be deemed a major disaster under federal law that embraces a narrower definition of "major disaster" than that set forth in § 28-1 (2), this court concluded that the COVID-19 pandemic constituted a "serious disaster" for which the governor could proclaim the existence of a civil preparedness emergency under § 28-9 (a); moreover, such a proclamation empowered the governor, pursuant to § 28-9 (b) (1), to modify or suspend any law or requirement that conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of public health, and, pursuant to § 28-9 (b) (7), to take steps that are reasonably necessary in light of the emergency to protect the health, safety and welfare of the people of Connecticut, and all of the challenged executive orders fell within either or both of those provisions.

2. The plaintiffs could not prevail on their claim that § 28-9 (b) (1) and (7) was an unconstitutional delegation by the General Assembly of its legislative powers to the governor, in violation of the separation of powers provision of the Connecticut constitution: in enacting § 28-9, the General Assembly set forth the policy for the governor to follow in the event of a serious disaster and provided standards that both limited the governor's authority to act and were sufficient to guide the exercise of his authority, as the governor could act under § 28-9 (b) (1) only after he proclaimed a civil preparedness emergency or declared a public health emergency, his actions under that provision were limited in duration and to suspending or modifying, rather than repealing, laws, and only to the extent that they were in conflict with the execution of civil preparedness functions or were required to protect public health, and the governor could act under § 28-9 (b) (7) only after he proclaimed a civil preparedness emergency and only to the extent reasonably necessary to protect the health, safety and welfare of the people of Connecticut; moreover, it was reasonable for the legislature to conclude that the executive branch would be far better suited to respond to a serious disaster with the speed and flexibility needed to protect the public health

and welfare, as the legislature is not in session continuously and would not be well positioned to mount a rapid response to a serious disaster, especially one that develops and evolves quickly and unpredictably, and thus requires an ongoing and agile response; furthermore, a legislative committee with statutory authority to disapprove of the governor's public health emergency declaration provided oversight of his actions, and the legislature had the ability to impose greater oversight or to amend or repeal § 28-9 to further limit the governor's authority.

Argued December 11, 2020—officially released March 29, 2021*

*Procedural History*

Action to enjoin the defendant from enforcing certain executive orders, and for other relief, brought to the Superior Court in the judicial district of New Haven and transferred to the judicial district of Waterbury, Complex Litigation Docket, where the case was tried to the court, *Bellis, J.*; judgment denying the plaintiffs' request for injunctive and declaratory relief, and the plaintiff, upon certification by the Chief Justice pursuant to General Statutes § 52-265a that a matter of substantial public interest was at issue, appealed to this court. *Affirmed.*

*Jonathan J. Klein*, for the appellants (plaintiffs).

*Philip Miller*, assistant attorney general, with whom, on the brief, were *William Tong*, attorney general, *Clare E. Kindall*, solicitor general, and *Alma Rose Nunley*, assistant attorney general, for the appellee (defendant).

*Opinion*

McDONALD, J. For more than one year now, the world has been in the unyielding grip of a highly virulent infectious disease that, to date, has infected approximately 127 million people worldwide and has killed more than 2.7 million individuals. Of those deaths, about 20 percent, or approximately 549,000, have been in the United States of America. In Connecticut alone, more than 305,000 people have been infected and more than 7800 have died.[1] These numbers, while jarring on their own, tell but one part of the enormous toll inflicted on society since the pandemic's onset. Around the country—indeed the world—large segments of economic activity have been severely disrupted, if not fallen into collapse, millions of people have lost their employment, many hospitals and other health-care operations have been overrun by gravely ill and dying patients, and extraordinary lockdowns ordered by government officials, in an effort to abate the rate of infection, have limited the free flow of personal and commercial activity. As this opinion is issued, it is uncertain when, or how, the pandemic will end.

The disease that has caused so much death and damage is known as COVID-19. It is a respiratory disease caused by a virus that is transmitted easily from person to person and can result in serious illness or death. According to the Centers for Disease Control and Prevention (CDC), the virus is primarily spread through respiratory droplets from infected individuals coughing, sneezing, or talking while in close proximity to other people. Centers for Disease Control & Prevention, How COVID-19 Spreads (last updated October 28, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited March 29, 2021). On January 31, 2020, the United States Department of Health and Human Services declared a national public health emergency, effective January 27, 2020, on the basis of the rising number of confirmed COVID-19 cases in the United States. United States Department of Health & Human Services, Press Release, Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (January 31, 2020), available at https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html (last visited March 29, 2021). The CDC explained that COVID-19 "represents a tremendous public health threat." Centers for Disease Control & Prevention, Press Release, Update on COVID-19 (February 21, 2020), available at https://www.cdc.gov/media/releases/2020/t0221-cdc-tel-ebriefing-covid-19.html (last visited March 29, 2021).

With this context in mind, we turn to the matter before us, which requires this court to consider the extent of the governor's authority to issue executive orders during the civil preparedness emergency he declared pursu-

ant to General Statutes § 28-9 in response to the COVID-19 pandemic. In particular, we consider whether the defendant, Governor Ned Lamont, lawfully issued certain executive orders that limited various commercial activities at bars and restaurants throughout the state. To that end, we must determine whether the COVID-19 pandemic constitutes a "serious disaster" pursuant to § 28-9 and whether that statute empowers the governor to issue the challenged executive orders. Because we conclude that § 28-9 provides authority for the governor to issue the challenged executive orders, we also consider whether § 28-9 is an unconstitutional delegation of legislative authority to the governor in violation of the separation of powers provision of the Connecticut constitution. See Conn. Const., art. II. We conclude that the statute passes constitutional muster.

The pleadings and the record reveal the following undisputed facts and procedural history. On March 10, 2020, "[i]n response to the global pandemic of [COVID-19]," Governor Lamont "declare[d] a public health emergency and civil preparedness emergency throughout the [s]tate, pursuant to [General Statutes §§] 19a-131a and 28-9 . . . ." Governor Lamont has renewed the declaration of both emergencies twice, most recently on January 26, 2021. The emergencies currently remain in effect until April 20, 2021. On March 13, 2020, three days after Governor Lamont's declaration, President Donald J. Trump made "an emergency determination under [§] 501 (b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. [§§ 5121 –5207 (Stafford Act)]." Letter from President Donald J. Trump to Acting Secretary of the Department of Homeland Security Chad F. Wolf (March 13, 2020) p. 1. On March 28, 2020, President Trump determined that, beginning on January 20, 2020, the impacts of the COVID-19 pandemic on Connecticut "are of sufficient severity and magnitude to warrant a major disaster declaration under the [Stafford Act] . . . ." Federal Emergency Management Agency, Connecticut, Major Disaster and Related Determinations, 85 Fed. Reg. 31,542 (May 26, 2020).

Following Governor Lamont's declaration of the public health and civil preparedness emergencies, he promulgated a series of executive orders in an attempt to contain and mitigate the spread of COVID-19. Relevant to this appeal, on March 16, 2020, he issued Executive Order No. 7D, which provides, among other things, that "any location licensed for [on premise] consumption of alcoholic liquor in the [s]tate of Connecticut . . . shall only serve food or [nonalcoholic] beverages for [off premise] consumption." Executive Order No. 7D (March 16, 2020). In response to the rapidly evolving COVID-19 pandemic, Governor Lamont continued to promulgate a series of executive orders modifying Executive Order No. 7D. Specifically, in April, 2020, Governor Lamont issued Executive Order No. 7X, which

extended to May 20, 2020, Executive Order No. 7D's limitations on bars and restaurants. Given that the state had made some progress in stemming the spread of COVID-19, in May, 2020, Governor Lamont issued guidance called "Reopen Connecticut" to begin reopening portions of the state's economy. The goal of Reopen Connecticut was to "[p]roactively protect public health and speed up the pace of economic, educational, and community recovery while restoring Connecticut's quality of life." N. Lamont, Reopen Connecticut: Sector Rules for May 20th Reopen (May 18, 2020) (Reopen Connecticut), available at https://portal.ct.gov/-/media/ DECD/Covid_Business_Recovery/CTReopens_Offices_C4 _V1.pdf (last visited March 29, 2021). In service of that goal, Governor Lamont issued Executive Order No. 7MM, which permitted restaurants to serve food outside and ordered that "[a]lcoholic liquor may be served only in connection with outdoor dining . . . ." Executive Order No. 7MM (May 12, 2020). Thereafter, he issued Executive Order No. 7ZZ, which allowed the resumption of some indoor dining except that the ban on "the sale of alcohol by certain permittees without the sale of food . . . shall remain in effect and [is] extended through July 20, 2020." Executive Order No. 7ZZ (June 16, 2020). In July, 2020, and in response to certain developments related to COVID-19, Governor Lamont announced that he was suspending phase 3 of the Reopen Connecticut plan, which was previously scheduled to start on July 20, 2020.

In compliance with Executive Order No. 7D, and after determining that it would not be profitable to operate a takeout business, the plaintiffs, Kristine Casey and Black Sheep Enterprise, LLC, closed their establishment, Casey's Irish Pub, on March 16, 2020. Casey is the permittee of a café liquor permit for the pub, which has fifteen stools at the bar, two high-top tables, a pool table, and a maximum capacity of fifty-nine patrons. The pub does not typically serve hot meals, and approximately 90 percent of its revenue comes from the sale of alcohol. The parties agree that, because of the physical location of the pub, "[o]utdoor service is not a viable option . . . because the tables would completely block the sidewalk, and there would be no protection from cars approaching to park . . . ." The parties also stipulate that "[p]reparing takeout meals and sealed alcoholic beverages for [off premise] consumption is not a viable option . . . as Casey knows from her experience in operating the pub and dealing with her customer base that, without the pub atmosphere, there would be insufficient interest from her clientele to justify the expense of providing such service." The plaintiffs' pub remains closed, and the parties stipulate that "it is not economically or physically feasible for [the plaintiffs] to reopen the pub." Since the pub's shutdown, the plaintiffs have continued to pay rent in the amount of $3200 per month and operating expenses totaling approxi-

mately $14,000 per month without any income stream.

In June, 2020, the plaintiffs commenced this action against Governor Lamont, requesting the court to declare that he acted beyond his statutory and constitutional authority when he issued Executive Order Nos. 7D, 7G, 7N, 7T, 7X, 7MM and 7ZZ.[2] The operative complaint sought a "temporary and permanent injunction" against the enforcement of the challenged executive orders. The complaint also requested a judgment declaring the executive orders unconstitutional. The parties filed a stipulation of facts, and, after the filing of briefs, the case was tried to the court by way of oral argument and based on the briefs and the parties' stipulation of facts.[3]

Thereafter, the trial court, *Bellis*, *J.*, issued a memorandum of decision, in which it denied the plaintiffs' request for injunctive and declaratory relief, and the court rendered judgment for Governor Lamont. The court reasoned that the COVID-19 pandemic constitutes a "serious disaster" under § 28-9 (a) and Governor Lamont's executive orders were authorized by § 28-9 (b) (1) and (7). The court also concluded that § 28-9 is not an unconstitutional delegation of legislative authority to the governor because, when the General Assembly passed § 28-9, "it set forth a clear legislative policy" and "gave the governor the ability to implement measures to achieve this goal."

The plaintiffs appealed directly to this court pursuant to General Statutes § 52-265a, and the Chief Justice subsequently certified that this action involves a matter of substantial public interest. On appeal, the plaintiffs do not contend that the restrictions Governor Lamont imposed on the pub were unreasonable or were not related to the public health, safety, and welfare of the people of this state. Rather, they claim that Governor Lamont exceeded his statutory authority by issuing the challenged executive orders. The plaintiffs further contend that, even if Governor Lamont's executive orders are valid under § 28-9, § 28-9 (b) (1) and (7) is an unconstitutional delegation by the General Assembly of its legislative powers in violation of the separation of powers provision of the Connecticut constitution. See Conn. Const., art. II.

Governor Lamont disagrees and contends that, because the COVID-19 pandemic is a "serious disaster," § 28-9 provides him with statutory authority to limit the pub's operation. Governor Lamont further contends that § 28-9 does not violate the separation of powers provision of the Connecticut constitution because it does not infringe on legislative authority and it provides sufficient standards for implementation.[4]

Following oral argument, we issued a per curiam ruling on December 31, 2020, in which we affirmed the judgment of the trial court, explaining that Governor

Lamont's actions to date had been constitutional. We indicated at that time that a full opinion would follow. This is that opinion.

I

We begin with the plaintiffs' contention that, by issuing the challenged executive orders, Governor Lamont exceeded his statutory authority. Whether the governor has statutory authority to issue the challenged executive orders during a proclaimed civil preparedness emergency turns on whether the COVID-19 pandemic constitutes a "serious disaster" under § 28-9 (a). This presents a question of statutory interpretation over which our review is plenary. See, e.g., *Gould* v. *Freedom of Information Commission*, 314 Conn. 802, 810, 104 A.3d 727 (2014). We review § 28-9 in accordance with General Statutes § 1-2z and our familiar principles of statutory construction. See, e.g., *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 45–46, 213 A.3d 1110 (2019).

We begin with the text of § 28-9 (a), which provides in relevant part: "In the event of serious disaster, enemy attack, sabotage or other hostile action or in the event of the imminence thereof, the Governor may proclaim that a state of civil preparedness emergency exists, in which event the Governor may personally take direct operational control of any or all parts of the civil preparedness forces and functions in the state. Any such proclamation shall be effective upon filing with the Secretary of the State. . . ." Governor Lamont does not contend that the COVID-19 pandemic has resulted from an "enemy attack, sabotage or other hostile action . . . ." General Statutes § 28-9 (a). Rather, the governor relies on the term "serious disaster" to justify the civil preparedness emergency proclamation. The plaintiffs contend that the COVID-19 pandemic is not a "serious disaster" because the General Assembly did not intend that term "to include the contagion of disease." Governor Lamont contends that, regardless of whether the statute is plain and unambiguous, the COVID-19 pandemic constitutes a "serious disaster."

The term "serious disaster" is not defined in § 28-9 or in Chapter 517 of the General Statutes. The term "major disaster," however, is defined in the definitional provision of Chapter 517.[5] Specifically, General Statutes § 28-1 (2) defines "major disaster" as "*any catastrophe including, but not limited to,* any hurricane, tornado, storm, high water, wind-driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm or drought, or, regardless of cause, any fire, flood, explosion, or man-made disaster in any part of this state that, (A) in the determination of the President, causes damage of sufficient severity and magnitude to warrant major disaster assistance under the [Stafford Act], as amended from time to time, to supplement the efforts and available resources of this

state, local governments within the state, and disaster relief organizations in alleviating the damage, loss, hardship, or suffering caused by such catastrophe, or (B) in the determination of the Governor, requires the declaration of a civil preparedness emergency pursuant to section 28-9." (Emphasis added.)

Because the term "catastrophe" is not defined in § 28-1, we look to its common dictionary definition. See, e.g., *Studer* v. *Studer*, 320 Conn. 483, 488, 131 A.3d 240 (2016); see also General Statutes § 1-1 (a). "Catastrophe" is often defined as "a momentous tragic usu[ally] sudden event marked by effects ranging from extreme misfortune to utter overthrow or ruin . . . ." Webster's Third New International Dictionary (1961) p. 351; accord Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 194. The COVID-19 pandemic has caused vast disruption to everyday life, and it has had a devastating impact on our economy. K. Phaneuf, "CT Economy Will Struggle Until at Least 2030 To Recover from COVID, UConn Report Warns," CT Mirror, October 23, 2020, available at https://ctmirror.org/2020/10/23/ct-economy-will-struggle-until-at-least-2030-to-recover-from-covid-uconn-report-warns/ (last visited March 29, 2021). Most tragically, the United States has now recorded more COVID-19 deaths than the total number of Americans killed during World Wars I and II combined. See Congressional Research Service, American War and Military Operations Casualties: Lists and Statistics (Updated July 29, 2020) p. 2, available at https://crsreports.congress.gov/product/pdf/RL/RL32492 (last visited March 29, 2021). Thus, by any reasonable measure, the COVID-19 pandemic certainly fits the dictionary definition of catastrophe.

The plaintiffs note, however, that the enumerated list that follows the term "catastrophe" in § 28-1 (2) is limited to "weather conditions, seismic activity, fire, explosion and man-made conditions . . . ." As a result, the plaintiffs argue that there is no language in § 28-1 (2) that indicates any legislative "intent to include the contagion of disease." The plaintiffs argue, albeit implicitly, that we should apply the statutory interpretation rule of ejusdem generis, which provides that, "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." (Internal quotation marks omitted.) *State* v. *Terwilliger*, 314 Conn. 618, 658, 104 A.3d 638 (2014).

Although it is true that the listed examples of catastrophes do not include the contagion of disease, the plaintiffs' argument fails to consider that the list is preceded by the phrase "*including, but not limited to* . . . ." (Emphasis added.) General Statutes § 28-1 (2). By including this phrase, the legislature evinced its intent that a "major disaster" not be limited in scope to the enumerated events, as the plaintiffs contend.[6] See

*United States* v. *West*, 671 F.3d 1195, 1200–1201 (10th Cir. 2012) (citing cases holding that doctrine of ejusdem generis is inapplicable when statutory enumeration is preceded by phrase "including, but not limited to"); see also *Tomick* v. *United Parcel Service, Inc.*, 324 Conn. 470, 479, 153 A.3d 615 (2016) ("[r]eading the phrase 'including but not limited to,' as expansive"); *Lusa* v. *Grunberg*, 101 Conn. App. 739, 756, 923 A.2d 795 (2007) ("the phrase [including but not limited to] convey[s] a clear intention that the items listed in the definition do not constitute an exhaustive or exclusive list" (internal quotation marks omitted)). Indeed, as Governor Lamont contends, an expansive reading is warranted in this context given that the General Assembly instructed him to exercise the powers delegated to him under § 28-9 broadly for "the protection of the public health"; General Statutes § 28-9 (b) (1); and "to protect the health, safety and welfare of the people of the state . . . ." General Statutes § 28-9 (b) (7). A narrow interpretation of the circumstances under which the governor would have authority to proclaim a civil preparedness emergency, as the plaintiffs contend, would frustrate this legislative intent.

Moreover, it would be absurd for the statutory scheme to be interpreted such that the governor could declare a civil preparedness emergency for an event such as a snowstorm, but not for the worst pandemic that has impacted the state in more than one century. We decline to construe the meaning of "major disaster" in such a manner. See, e.g., *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 803, 955 A.2d 15 (2008) ("[i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended" (internal quotation marks omitted)).

To the extent the meaning of "major disaster" is ambiguous given the tension between the enumerated list of catastrophes and the legislature's use of the phrase "including, but not limited to," we look to extratextual sources to gain further insight into whether the legislature intended that a global pandemic could constitute a major disaster. The legislative history of both §§ 28-1 (2) and 28-9 provides further support for the conclusion that the General Assembly did not intend the term "major disaster" to be limited only to catastrophes caused by weather conditions, seismic activity, fire, explosion and man-made conditions, as the plaintiffs contend. Under earlier versions of § 28-9, the governor was authorized to proclaim a civil preparedness emergency "[i]n the event of serious natural disaster, enemy attack, sabotage or other hostile action or in the event of the imminence thereof . . . ." General Statutes (1958 Rev.) § 28-9; see also General Statutes (1955 Supp.) § 1913d (adding "serious natural disaster" to list of events). At that time, Chapter 517 did not contain a definition of "disaster" or "serious national disaster." In 1975, however,

the General Assembly inserted a definition of "disaster" into § 28-1. See Public Acts 1975, No. 75-643, § 1 (P.A. 75-643), codified at General Statutes (Rev. to 1977) § 28-1 (b). It provided in relevant part: " 'Disaster' means occurrence or imminent threat of widespread or severe damage, injury or loss of life or property resulting from any natural or manmade cause, including but not limited to, fire, flood, earthquake, wind, storm, wave action, oil spill or other water contamination . . . *epidemic*, air contamination, blight, drought, infestation, explosion, riot or hostile military or paramilitary action." (Emphasis added.) P.A. 75-643, § 1. Accordingly, at least as early as 1975, the General Assembly clearly anticipated that an epidemic could constitute a "disaster."

Since 1975, the General Assembly has amended the definitions in § 28-1 on several occasions in order to align state law with the federal Stafford Act. See *Sena* v. *American Medical Response of Connecticut, Inc.*, supra, 333 Conn. 50 n.13. Specifically, in 1979, the General Assembly removed the definition of "disaster" from § 28-1 and added the definition of "major disaster" to better align state and federal law. Public Acts 1979, No. 79-417, § 1 (P.A. 79-417), codified at General Statutes (Rev. to 1981) § 28-1 (b); see 22 H.R. Proc., Pt. 5, 1979 Sess., p. 1648 ("The intent of this [b]ill is to align the [s]tate laws with the [f]ederal laws. . . . Further, [the bill] inserts two new definitions for major disasters and emergency, while repealing the old definition for disaster. Again, this is done to align [f]ederal and [s]tate legislation."). Public Act No. 79-417 defined "major disaster" in relevant part as "any hurricane, storm, flood, high water, wind driven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, drought, fire, explosion, or other catastrophe in any part of this state which, in the determination of the president, causes damage of sufficient severity and magnitude to warrant major disaster assistance under the Federal Disaster Relief Act of 1974 . . . ." P.A. 79-417, § 1. This definition was nearly identical to the federal definition of "major disaster" in the federal Disaster Relief Act of 1974. See Disaster Relief Act of 1974, Pub. L. No. 93-288, § 102, 88 Stat. 143, 144, codified at 42 U.S.C. § 5122 (2) (Supp. IV 1974). Although the definition of "major disaster" did not list epidemic or pandemic, there is nothing in the legislative history to indicate that the General Assembly intended that an epidemic or pandemic of sufficient severity could not constitute a "major disaster," when, just four years earlier, it evinced its intent that it could constitute a "disaster." The changes to the definition were merely intended to align state and federal law.[7]

The plaintiffs' contention that the term "major disaster" is limited to weather conditions, seismic activity, fire, explosion and man-made conditions is further belied by the legislature's changes to the definition of "major disaster" in Number 06-15 of the 2006 Public

Acts (P.A. 06-15). In 1988, Congress amended the Disaster Relief Act of 1974 and changed the definition of "major disaster" to "any *natural catastrophe* (including any hurricane, tornado, storm, high water, winddriven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought) . . . ." (Emphasis added.) The Disaster Relief and Emergency Assistance Amendments of 1988, Pub. L. No. 100-707, § 103, 102 Stat. 4689, 4690, codified at 42 U.S.C. § 5122 (2) (1988). Rather than adopting the new federal definition, as the General Assembly had previously done, in P.A. 06-15, it enacted a broader definition of "major disaster" by omitting the word "natural" and adding the phrases "including, but not limited to" and "manmade disaster . . . ." P.A. 06-15, § 1, codified at General Statutes (Rev. to 2007) § 28-1 (2). Thus, the current statutory definition of "major disaster" under Connecticut law is broader than the federal definition, which is limited to "natural catastrophe[s]"; 42 U.S.C. § 5122 (2) (2018); and encompasses a wider category of catastrophes beyond those listed in the federal definition. See General Statutes § 28-1 (2). Significantly, however, although the federal definition of "major disaster" is narrower than the state definition, President Trump concluded that the impacts of the COVID-19 pandemic on Connecticut were "of sufficient severity and magnitude to warrant a *major disaster declaration* under the [Stafford Act] . . . ." (Emphasis added.) Federal Emergency Management Agency, supra, 85 Fed. Reg. 31,542. It would be illogical to conclude that the effects of the COVID-19 pandemic in this state were of sufficient severity to constitute a "major disaster" under the narrower federal definition of "major disaster" but not sufficient to satisfy the broader state definition of the same term.[8] We decline to construe the statute in such a manner. Accordingly, we conclude that the COVID-19 pandemic constitutes a "major disaster," as that term is defined in § 28-1 (2).

Logically, it would seem that the meaning of the term "major disaster" set forth in § 28-1 (2) is substantially similar to the term "serious disaster" in § 28-9 (a). See Webster's Third New International Dictionary, supra, pp. 1363, 2073 (defining "major" as "involving grave risk: serious" and defining "serious" as "grave in disposition, appearance, or manner"). As this court has often explained, however, "we assume that the legislature has a different intent when it uses different terms in the same statutory scheme." *Southern New England Telephone Co.* v. *Cashman*, 283 Conn. 644, 662, 931 A.2d 142 (2007) (*Katz, J.*, concurring). Thus, we must determine whether a major disaster also constitutes a serious disaster. This question is quickly resolved based on a review of the statutory scheme. Section 28-1 (2) provides that a "major disaster" includes "any catastrophe" that "(B) in the determination of the Governor, requires the declaration of a civil preparedness emer-

gency pursuant to section 28-9." The General Assembly's reference to a civil preparedness emergency under § 28-9 in the definition of "major disaster" set forth in § 28-1 (2) makes clear that it intended that any event that constitutes a "catastrophe" under § 28-1 (2) also constitutes a "serious disaster" if the governor declares a civil preparedness emergency under § 28-9. Put differently, if an event constitutes a "catastrophe" under § 28-1 (2), and the governor determines that the proclamation of a civil preparedness emergency under § 28-9 is required to address it, then the "catastrophe" necessarily is both a "major disaster" and a "serious disaster."[9] Because, as we have explained, the COVID-19 pandemic constitutes a "catastrophe," and Governor Lamont has declared a civil preparedness emergency under § 28-9, we conclude that the COVID-19 pandemic constitutes a "serious disaster" under § 28-9 (a).

Having concluded that the COVID-19 pandemic constitutes a serious disaster and, therefore, that Governor Lamont was statutorily authorized to proclaim a civil preparedness emergency, we must determine whether such proclamation empowered him to issue the challenged executive orders. Relevant to this appeal, subsection (b) of § 28-9 provides in relevant part that, "upon [a civil preparedness emergency] proclamation, the following provisions of this section and the provisions of section 28-11 shall immediately become effective and shall continue in effect until the Governor proclaims the end of the civil preparedness emergency:

"(1) Following the Governor's proclamation of a civil preparedness emergency pursuant to subsection (a) of this section or declaration of a public health emergency pursuant to section 19a-131a, the Governor may modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. The Governor shall specify in such order the reason or reasons therefor and any statute, regulation or requirement or part thereof to be modified or suspended and the period, not exceeding six months unless sooner revoked, during which such order shall be enforced. . . .

* * *

"(7) The Governor may take such other steps as are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state, to prevent or minimize loss or destruction of property and to minimize the effects of hostile action . . . ."

In short, following the proclamation of a civil preparedness emergency pursuant to § 28-9 (a), subsection

(b) (1) empowers the governor to modify or suspend any statute, regulation or requirement that conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. Subsection (b) (7) additionally empowers the governor to take other steps that are reasonably necessary in light of the emergency to protect the health, safety, and welfare of the people of the state. All of the challenged executive orders fall squarely within either or both of these provisions.

Executive Order Nos. 7D and 7G, which closed bars and restaurants to all on premise service of food and beverages, were promulgated as part of a series of community mitigation strategies that were designed to encourage social distancing and protect public health and safety and to "increase containment of the virus and to slow transmission of the virus . . . ." Executive Order No. 7G (March 19, 2020). As the trial court noted, it is "now common knowledge that COVID-19 is spread by people who are in close physical contact with each other, and it is also well known that people who are drinking alcohol in bars tend to gather in close proximity in order to socialize." Other executive orders similarly provided logistical guidance to bars and restaurants in an effort to limit the number of people within these establishments or otherwise effectuate Executive Order No. 7D. See Executive Order No. 7N (March 26, 2020) (directing businesses that remained open to serve food and drink for off premise consumption to "limit entrance of customers into their locations to the minimum extent necessary to pick up and/or pay for orders, use touchless payment systems, and require remote ordering and payment"); Executive Order No. 7T (April 2, 2020) (expanding list of sealed containers of alcohol that liquor permit holders could sell under conditions set forth in Executive Order No. 7G); Executive Order No. 7X (April 10, 2020) (extending Executive Order No. 7D's limitations on bars and restaurants through May 20, 2020). Governor Lamont noted the importance of each executive order to "reduc[ing] [the] spread of COVID-19," "increas[ing] containment of the virus," and "slow[ing] transmission of the virus . . . ." Executive Order No. 7G (March 19, 2020); accord Executive Order No. 7T (April 2, 2020). These executive orders fell within Governor Lamont's authority under § 28-9 (b) (7) to "take such other steps as are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state . . . ." Indeed, the plaintiffs do not contend that the restrictions Governor Lamont imposed on the pub were unreasonable or were not related to the public health, safety, and welfare of the people of this state.

Finally, Governor Lamont issued Executive Order Nos. 7MM and 7ZZ as the state began making progress in stemming the spread of COVID-19 in order to "[p]roactively protect public health and speed up the pace of

economic, educational, and community recovery while resorting Connecticut's quality of life." Reopen Connecticut, supra. Executive Order No. 7MM permitted restaurants to serve food outside and ordered that "[a]lcoholic liquor . . . be served only in connection with outdoor dining . . . ." Executive Order No. 7MM (May 12, 2020). Governor Lamont explained in the executive order that, when on premise dining was first permitted, it was limited to outdoor service because "public health experts ha[d] determined that the risk of transmission of COVID-19 [was] reduced in outdoor areas, including where there is more sunlight, greater air movement, and greater space to maintain distance between people . . . ." Id. Thereafter, Governor Lamont issued Executive Order No. 7ZZ, which allowed the resumption of indoor dining except that the ban on "the sale of alcohol by certain permittees without the sale of food . . . [was to] remain in effect and [was] extended through July 20, 2020." Executive Order No. 7ZZ (June 16, 2020). As with his earlier executive orders restricting activities at bars and restaurants, Executive Order Nos. 7MM and 7ZZ also fell within Governor Lamont's authority under § 28-9 (b) (7) to "take such other steps as are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state . . . ." In each of the challenged executive orders, Governor Lamont explained the public health rationale that required the action in order to protect the health, safety, and welfare of the people of this state.

Moreover, Executive Order Nos. 7MM and 7ZZ are also authorized by the governor's authority under § 28-9 (b) (1) to modify or suspend a statute if it conflicts with "the efficient and expeditious execution of civil preparedness functions or the protection of the public health." Executive Order No. 7MM specifically provides that "[t]itle 30 of the . . . General Statutes, including [§§] 30-22 (a) and 30-22a (a) . . . are modified to the extent they conflict with, or create additional requirements [with respect to], the sale of alcoholic liquor . . . ." Executive Order No. 7MM (May 12, 2020). General Statutes § 30-22a sets forth the terms of café liquor permits for the sale of alcoholic liquor. Executive Order No. 7MM plainly modified § 30-22a (a), directing that, if a café intends to resume sales of alcoholic liquor for on premise consumption, such liquor may be consumed only outdoors and can be sold only in conjunction with the sale of food. Executive Order No. 7ZZ expanded on this modification of § 30-22a (a) by also requiring that the sale of food be accompanied by the sale of alcoholic liquor upon the resumption of indoor dining. Executive Order No. 7ZZ also explicitly provides that "[§] 28-9 (b) . . . authorizes the modification or suspension . . . of any statute . . . that conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of public health . . . ." Executive

Order No. 7ZZ (June 16, 2020). Both executive orders are thus also supported by the governor's authority under § 28-9 (b) (1), which authorizes the governor to modify or suspend any statute, regulation or requirement, if it conflicts with the efficient and expeditious execution of civil preparedness functions or the protection of the public health. Accordingly, we conclude that Governor Lamont did not exceed his statutory authority when he issued the challenged executive orders in an effort to contain the spread of COVID-19.

## II

We now consider the plaintiffs' contention that § 28-9 (b) (1) and (7) is an unconstitutional delegation by the General Assembly of its legislative powers to the governor, in violation of the separation of power provision of the Connecticut constitution. See Conn. Const., art. II.

We begin with the relevant legal principles. A challenge to "[t]he constitutionality of a statute presents a question of law over which our review is plenary. . . . It [also] is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) *Keane* v. *Fischetti*, 300 Conn. 395, 402, 13 A.3d 1089 (2011).

"The [c]onstitution of this state provides for the separation of the governmental functions into three basic departments, legislative, executive and judicial, and it is inherent in this separation, since the law-making function is vested exclusively in the legislative department, that the [l]egislature cannot delegate the law-making power to any other department or agency." (Internal quotation marks omitted.) *University of Connecticut Chapter, AAUP* v. *Governor*, 200 Conn. 386, 394, 512 A.2d 152 (1986). We have explained that "[t]he primary purpose of [the separation of powers] doctrine is to prevent commingling of different powers of government in the same hands. . . . The constitution achieves this purpose by prescribing limitations and duties for each branch that are essential to each branch's independence and performance of assigned powers. . . . It is axiomatic that no branch of government organized under a constitution may exercise any power that is not explicitly bestowed by that constitution or that is not essential to the exercise thereof. . . . [Thus] [t]he separation of powers doctrine serves a dual function: it limits the exercise of power within each branch, yet ensures the independent exercise of that power." (Internal quota-

tion marks omitted.) *Persels & Associates, LLC* v. *Banking Commissioner*, 318 Conn. 652, 668–69, 122 A.3d 592 (2015).

Unlike the separation of powers doctrine that has developed under the federal constitution, "the historical evolution of Connecticut's governmental system [has] established a 'tradition of harmony' among the separate branches of government . . . ." *State* v. *McCleese*, 333 Conn. 378, 419, 215 A.3d 1154 (2019). "Recognizing that executive, legislative and judicial powers frequently overlap, we have consistently held that the doctrine of the separation of powers cannot be applied rigidly." *Bartholomew* v. *Schweizer*, 217 Conn. 671, 676, 587 A.2d 1014 (1991). As we have recognized, "the great functions of government are not divided in any such way that all acts of the nature of the function of one department can never be exercised by another department; such a division is impracticable, and if carried out would result in the paralysis of government. Executive, legislative and judicial powers . . . of necessity overlap each other, and cover many acts which are in their nature common to more than one department." (Internal quotation marks omitted.) *Seymour* v. *Elections Enforcement Commission*, 255 Conn. 78, 107, 762 A.2d 880 (2000), cert. denied, 533 U.S. 951, 121 S. Ct. 2594, 150 L. Ed. 2d 752 (2001). For example, the General Assembly does not have exclusive responsibility for legislating. Rather, the legislature and the governor work together to pass legislation. See, e.g., Conn. Const., art. IV, § 15 ("Each bill which shall have passed both houses of the general assembly shall be presented to the governor. . . . If the governor shall approve a bill, he shall sign and transmit it to the secretary of the state, but if he shall disapprove, he shall transmit it to the secretary with his objections, and the secretary shall thereupon return the bill with the governor's objections to the house in which it originated.").

A statute will be held unconstitutional on the ground that it violates the separation of powers only if it "(1) confers on one branch of government the duties which belong exclusively to another branch . . . or (2) if it confers the duties of one branch of government on another branch which duties significantly interfere with the orderly performance of the latter's essential functions." (Citation omitted.) *University of Connecticut Chapter, AAUP* v. *Governor*, supra, 200 Conn. 394–95. Applying these standards to § 28-9 (b) (1) and (7), we conclude that the plaintiffs cannot meet their heavy burden of establishing that the statute is a violation of the separation of powers provision of article second of the Connecticut constitution on the basis that it impermissibly delegates legislative authority to the governor.

Section 28-9 sets forth the General Assembly's policy that the state must be able to mount a rapid and agile response to a "serious disaster," and the executive

branch, namely, the governor, is most capable of carrying out that response. Significantly, although the "lawmaking power is in the legislative branch of our government and cannot constitutionally be delegated . . . the General Assembly may carry out its legislative policies within the police power of the state by delegating to an administrative agency the power to fill in the details." (Citation omitted; internal quotation marks omitted.) *New Milford* v. *SCA Services of Connecticut, Inc.*, 174 Conn. 146, 149, 384 A.2d 337 (1977). Put differently, the General Assembly has "the right to determine in the first instance what is the nature and extent of the danger to the public health, safety, morals and welfare and what are the measures best calculated to meet that threat." *Buxton* v. *Ullman*, 147 Conn. 48, 55, 156 A.2d 508 (1959), appeal dismissed sub nom. *Poe* v. *Ullman*, 367 U.S. 497, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961). Once the General Assembly has made that determination, it may carry out that policy by delegating to the executive branch the power to "fill in the details" in order to effectuate that policy.[10] "In order to render admissible such delegation of legislative power, however, it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out, or lay down an intelligible principle to which the administrative officer or body must conform, with a proper regard for the protection of the public interests and with such degree of certainty as the nature of the case permits . . . ." (Internal quotation marks omitted.) *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 572, 964 A.2d 1213 (2009). As the United States Supreme Court has explained, "[s]o long as Congress shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." (Internal quotation marks omitted.) *Mistretta* v. *United States*, 488 U.S. 361, 372, 109 S. Ct. 647, 102 L. Ed. 2d 714 (1989); see also *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 635, 72 S. Ct. 863, 96 L. Ed. 1153 (1952) (Jackson, J., concurring in the judgment and opinion of the court) ("[w]hen the [p]resident acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate"). That is, "[t]he constitutional question is whether Congress has supplied an intelligible principle to guide the delegee's use of discretion." *Gundy* v. *United States*,    U.S.    , 139 S. Ct. 2116, 2123, 204 L. Ed. 2d 522 (2019) (plurality opinion). "[T]he answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides." Id.

In enacting § 28-9, the General Assembly set forth the policy for the governor to follow in the event of a serious disaster. Specifically, through § 28-9 (b) (1), the General

Assembly's policy directs that, upon the proclamation of a civil preparedness emergency, or upon the declaration of a public health emergency under § 19a-131a, the governor may "modify or suspend . . . any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, *is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health*." (Emphasis added.) Section 28-9 (b) (1) further requires the governor to specify the reasons for suspending or modifying the statute, regulation or requirement and "the period, *not exceeding six months* unless sooner revoked, during which such order shall be enforced." (Emphasis added.) The legislature set forth the standards that limit the governor's authority to act under § 28-9 (b) (1) in three primary ways. First, the governor may act pursuant to subsection (b) (1) only after the governor has proclaimed a civil preparedness emergency or declared a public health emergency. Second, the governor's actions are limited to modifying or suspending—not repealing—statutes or other regulations only to the extent that they are in conflict with the execution of civil preparedness functions or are required to protect the public health, and the governor is required to specify the reasons for the modification or suspension. Finally, the governor's actions have temporal limitations, namely, the period of time the modification or suspension may be enforced is limited to six months.[11] Therefore, any actions the governor takes under subsection (b) (1) are temporary, that is, he cannot modify or suspend any statutes or regulations permanently.

Section 28-9 (b) (7) similarly makes clear that the governor may take other steps to address the serious disaster, only if they "are reasonably necessary in the light of the emergency to protect the health, safety and welfare of the people of the state, to prevent or minimize loss or destruction of property and to minimize the effects of hostile action." In other words, the governor may act under subsection (b) (7) only after he has proclaimed a civil preparedness emergency, and his actions are limited to those that are *reasonably necessary* to protect the health, safety, and welfare of the people of this state. Moreover, the governor may act only to the extent that the health, safety, and welfare of the people are implicated by this *particular* serious disaster. The governor would not, for example, be able to issue an executive order forbidding restaurants from selling unhealthy foods during the COVID-19 pandemic. Although eating healthy foods is undoubtedly related to the health and welfare of the people of this state, such an action is not reasonably necessary to address the current pandemic. Likewise, should a hurricane of sufficient severity require the governor to proclaim a civil preparedness emergency, mandating that Connecticut citizens wear masks would not be a proper action

under subsection (b) (7) merely because it might have the incidental health benefit of reducing the spread of the common cold. Rather, the governor's actions under subsection (b) (7) must be reasonably necessary to address the specific serious disaster that warranted the civil preparedness emergency proclamation.

Our case law supports the conclusion that § 28-9 (b) (1) and (7) is not an unconstitutional delegation of legislative authority. In *University of Connecticut Chapter, AAUP* v. *Governor*, supra, 200 Conn. 386, this court upheld the constitutionality of General Statutes (Rev. to 1985) § 4-85 (b), which authorized the governor to "reduce budgetary allotments by up to 5 percent under certain specified circumstances." Id., 387. The plaintiffs argued that the statute violated the separation of powers provision because it attempted to delegate a strictly legislative function, namely, budgeting. Id., 393. This court rejected that argument. We explained that, rather than interfering with a legislative function, § 4-85 (b) enabled the governor "to supervise the execution of the budget." Id., 396. We explained that this role was particularly suited to the executive branch, which is "most capable of having detailed and contemporaneous knowledge regarding finances. Under the constitutional separation of powers, the governor uses that knowledge in making such spending decisions and to see that the laws are faithfully executed." Id., 397. Here, the General Assembly similarly expressed its policy that the governor is most appropriately suited to use the expertise of the executive branch—particularly in this case, the Department of Public Health—to respond to a potentially, rapidly evolving serious disaster and to take the most appropriate steps to safeguard the people of this state. In *University of Connecticut Chapter, AAUP*, we also rejected the plaintiffs' argument that the standards " 'deems necessary' " and " 'a change of circumstances' " did not provide sufficient standards to the governor. Id., 398. We noted that requiring more specific standards "would hamper the flexibility needed for the governor to monitor and administer expenditures and to supervise the execution of the budget." Id., 399. The standards set forth in subsection (b) (1) and (7) similarly provide sufficient standards to guide the governor's exercise of his authority.

By contrast, in *State* v. *Stoddard*, 126 Conn. 623, 633–34, 13 A.2d 586 (1940), this court reversed a defendant's criminal conviction and struck down a statute that authorized the milk administrator to set the minimum price for milk. The only guidance the General Assembly provided to the administrator in setting the price was to "take into consideration the type of container used and other cost factors [that] should influence the determination of such prices." (Internal quotation marks omitted.) Id., 625. This court concluded that this language did not provide "such prescribed standards or principles, courses of procedure, and rules of decision

as is [required] to justify the delegation of powers attempted thereby . . . ." Id., 633. We conclude that, contrary to the plaintiffs' assertions, the standards imposed by subsection (b) (1) and (7) provide greater guidance to the governor than did the statute in *Stoddard*.

We acknowledge that subsection (b) (1) and (7) is a broad grant of authority from the General Assembly to the governor. A broad grant of authority, however, is not the same as limitless or standardless authority. As we have explained, although the General Assembly may not delegate its "law-making" function, it may delegate "some *considerable* segment of its legislative authority." (Emphasis added.) *Salmon Brook Convalescent Home, Inc.* v. *Commission on Hospitals & Health Care*, 177 Conn. 356, 363, 417 A.2d 358 (1979). The United States Supreme Court has similarly explained that, once the legislature has made a policy determination, "[i]t is no objection" that the legislation "call[s] for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework." *Yakus* v. *United States*, 321 U.S. 414, 425, 64 S. Ct. 660, 88 L. Ed. 834 (1944); see also *Whitman* v. *American Trucking Associations, Inc.*, 531 U.S. 457, 475, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001) ("[a] certain degree of discretion, and thus of [law-making], inheres in most executive or judicial action" (internal quotation marks omitted)). In a recent concurrence in connection with the United States Supreme Court's denial of injunctive relief pertaining to the California governor's COVID-19 restrictions on the number of people permitted in houses of worship, Chief Justice John Roberts emphasized the need for elected leaders to have broad authority to respond to rapidly evolving emergencies. See *South Bay United Pentecostal Church* v. *Newsom*,    U.S.   , 140 S. Ct. 1613, 207 L. Ed. 2d 154 (2020) (Roberts, C. J., concurring in denial of application for injunctive relief). He explained that "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. . . . When [elected] officials undertake . . . to act in areas fraught with medical and scientific uncertainties, *their latitude must be especially broad*." (Citation omitted; emphasis added; internal quotation marks omitted.) Id.

In enacting § 28-9 (b), the General Assembly was as precise as it could be in defining the contours of the governor's authority given that there are myriad serious disasters that could arise and the actions the governor would be required to take could vary significantly from one serious disaster to another. See, e.g., *University of Connecticut Chapter, AAUP* v. *Governor*, supra, 200 Conn. 398 ("these standards are constitutionally sufficient under our law in that they are as definit[e] as is reasonably practicable under the circumstances" (inter-

nal quotation marks omitted)); see also *American Power & Light Co*. v. *Securities & Exchange Commission*, 329 U.S. 90, 105, 67 S. Ct. 133, 91 L. Ed. 103 (1946) ("[t]he legislative process would frequently bog down if Congress were constitutionally required to appraise [beforehand] the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation"); *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 572 ("[i]n order to render admissible such delegation of legislative power . . . it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out . . . and *with such degree of certainty as the nature of the case permits*" (emphasis added; internal quotation marks omitted)).[12] What could be statutorily or constitutionally appropriate in one serious disaster may not be in another. As Senator Martin M. Looney explained during a special, statutorily created legislative committee's September 4, 2020 meeting to discuss Governor Lamont's public health emergency declaration, § 28-9 is broad because the governor must be able to quickly address the serious disaster. Declaration of a Public Health Emergency Committee Meeting (September 4, 2020), available at https://ct-n.com/ctnplayer.asp?odID=17659 (13:10 through 13:36) (last visited March 29, 2021). Requiring more specific standards "would hamper the flexibility needed" for the governor to respond to the myriad different circumstances that may constitute a serious disaster. *University of Connecticut Chapter, AAUP* v. *Governor*, supra, 399.

Moreover, it is reasonable for the legislature to conclude that the executive branch of government would be far better suited to respond to a serious disaster with the speed and flexibility needed to protect the public health and welfare. Specifically, the legislature itself is not in session continuously and would not be well positioned to mount a rapid response to a serious disaster, especially one that develops and evolves quickly or unpredictably, and thus requires an ongoing and agile response. Indeed, the former speaker of the House of Representatives, Joe Aresimowicz, noted during the September, 4, 2020 meeting of the Declaration of a Public Health Emergency Committee that, because the Connecticut legislature is part-time, they are "not structured to handle [a serious disaster]." Declaration of a Public Health Emergency Committee Meeting, supra, (17:56). Similarly, Senator Mary Daugherty Abrams, the senate chairperson of the Public Health Committee, explained there are times "we need to take swift, deliberate action as a government to protect the public's health, and the Executive Branch is best equipped to do that. . . . There are 187 members of the legislative body, and the thought that we could all come together swiftly and deliberately to respond to what's come up with the COVID . . . crisis is not realistic." Id., (1:09:19 through 1:09:54).

In rejecting a similar argument that emergency powers of the governor of Kentucky during the COVID-19 pandemic violated the separation of powers provision of that state's constitution, the Supreme Court of Kentucky explained that it was reasonable for the governor to have greater authority in times of emergency "given [the] government's tripartite structure *with a legislature that is not in continuous session*." (Emphasis added.) *Beshear* v. *Acree*, 615 S.W.3d 780, 806 (Ky. 2020). The court further explained that "[h]aving a citizen legislature that meets part-time as opposed to a full-time legislative body that meets year-round, as some states have, generally leaves [the Kentucky] General Assembly without the ability to legislate quickly in the event of emergency unless the emergency arises during a regular legislative session." (Footnote omitted.) Id., 807. The same rationale applies here.

That having been said, we pause to note that the legislature chose not to include a mechanism for more direct legislative oversight of a declared civil preparedness emergency, as it did for a man-made disaster under § 28-9 (a) or a public health emergency declaration under § 19a-131a. See General Statutes § 28-9 (a) ("[a]ny such proclamation, or order issued pursuant thereto, issued by the Governor because of a disaster resulting from man-made cause may be disapproved by majority vote of a joint legislative committee"); see also General Statutes § 19a-131a (b) (1) ("[a]ny . . . declaration [of a public health emergency] issued by the Governor may be disapproved and nullified by majority vote of a committee consisting of the president pro tempore of the Senate, the speaker of the House of Representatives, the majority and minority leaders of both houses of the General Assembly and the cochairpersons and ranking members of the joint standing committee of the General Assembly having cognizance of matters relating to public health"). Several high courts of our sister states have noted the importance of such legislative oversight under similar statutory schemes. See, e.g., *Beshear* v. *Acree*, supra, 615 S.W.3d 811–12 ("the [Kentucky] General Assembly [is allowed] to make the determination itself if the [g]overnor has not declared an end to the emergency 'before the first day of the next regular session of the General Assembly' "); *Desrosiers* v. *Governor*, 486 Mass. 369, 384, 158 N.E.3d 827 (2020) ("the [Massachusetts] [l]egislature also has at its disposal a way to curb the [g]overnor's powers under the [Massachusetts Civil Defense Act], should it desire to do so"); *Elkhorn Baptist Church* v. *Brown*, 366 Or. 506, 526, 466 P.3d 30 (2020) ("the [Oregon] [g]overnor's emergency powers are limited in that they can be terminated by the [Oregon] legislature"). This observation does not alter our constitutional analysis in the present case but warrants mention.

Legislative oversight has not been altogether lacking.

In the related context of considering Governor Lamont's public health emergency declaration, a legislative committee, namely, the Declaration of a Public Health Emergency Committee, formed pursuant to § 19a-131a (b) (1), has met twice since Governor Lamont first declared the civil preparedness and public health emergencies. The committee, consisting of the president pro tempore of the Senate, the speaker of the House of Representatives, the majority and minority leaders of both houses, and the cochairpersons and ranking members of the Public Health Committee, met for the first time in the history of this state on March 11, 2020, just one day after the governor first declared the public health and civil preparedness emergencies. During that meeting, the committee met "to consider [Governor Lamont's] declaration of a public health emergency." Declaration of a Public Health Emergency Committee, Meeting Minutes (March 11, 2020) p. 1, available at https://www.cga.ct.gov/ph/tfs/20200311_Public%20Health%20Emergency%20Committee/20200311/Minutes_pdf (last visited March 29, 2021). Senator Looney explained to the committee that, "under the statutes, this committee has the right to veto the [g]overnor's plan within [seventy-two] hours of this taking action . . . ." Id., p. 2. When asked by Senator Leonard A. Fasano whether the committee would be required to reconvene if Governor Lamont decided to reinvoke his authority after six months, Senator Looney explained that, if the governor "wanted to extend it beyond that time, it would require a new order, and [the committee] would have a new opportunity to meet like [it] did this time." Id. Finally, Senator Looney closed the meeting by noting that "it is within the committee's capacity to convene again by Friday [March 13, 2020] at 2:25 p.m., but, barring some other emergency, the committee has met the statutory requirements." Id., p. 4. The committee did not meet again within seventy-two hours of the first proclamation.

Thereafter, the committee met again on September 4, 2020, three days after Governor Lamont's September 1, 2020 declarations. After discussion regarding the scope of Governor Lamont's authority under both a civil preparedness emergency and a public health emergency,[13] the committee took up a motion to disapprove of Governor Lamont's declaration of a public health emergency pursuant to § 19a-131a. Declaration of a Public Health Emergency Committee Meeting, supra, (1:28:10 through 1:28:17). The motion failed, and the committee did not vote to disapprove of Governor Lamont's public health emergency declaration. Id., (1:43:29 through 1:44:11). We take this inaction as an indication of the committee's acquiescence in Governor Lamont's actions pursuant to his public health emergency authority. Although we most often employ this principle when "the legislature [fails] to take corrective action as manifesting the legislature's acquiescence in our construction of a statute"; (internal quotation marks omitted) *Spiotti* v. *Wolcott*, 326 Conn. 190, 202, 163 A.3d

46 (2017); the same principle is insightful here. In this case, the legislative committee with the statutory authority to disapprove of Governor Lamont's public health emergency declaration met on two occasions and declined to exercise its disapproval powers either time. Although not the equivalent of full legislative ratification, this procedure should significantly ameliorate concerns regarding legislative oversight. Should the plaintiffs seek to impose greater oversight of the governor's authority under the statutory scheme, whether in the context of a public health emergency or a civil preparedness emergency, the proper avenue is through an amendment to the statute through the legislature, not this court. See, e.g., *Castro* v. *Viera*, 207 Conn. 420, 435, 541 A.2d 1216 (1988) ("[I]t is up to the legislatures, not courts, to decide on the wisdom and utility of legislation. . . . [C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, [whose members] are elected to pass laws." (Internal quotation marks omitted.)).

In sum, § 28-9 sets forth the General Assembly's policy that, in the event of a serious disaster, the health, safety, and welfare of Connecticut's residents is of utmost importance. Section 28-9 (b) affords the governor considerable latitude to employ the "necessary means" for accomplishing that policy objective. *Norwalk Street Railway Co.'s Appeal*, 69 Conn. 576, 594, 37 A. 1080 (1897). But that latitude is neither standardless nor limitless. In addition to the limitations explicated previously, in the event an aggrieved party believes the governor has taken any particular action that exceeds his lawful authority or violates the state constitution, that party may seek redress from the courts. The legislature may also deem it proper to impose greater oversight of the governor's actions during a proclaimed civil preparedness emergency or otherwise amend or repeal § 28-9 to further limit the governor's authority.

Our conclusion that, although subsection (b) (1) and (7) represents a broad grant of authority to the governor, it is nonetheless constitutional finds support in the analysis of similar issues from the high courts of our sister states. For example, the Pennsylvania Supreme Court recently rejected a separation of powers challenge to that state's Emergency Management Services Code, which permits the governor of Pennsylvania to proclaim a disaster emergency and to take actions similar to those authorized by § 28-9. 35 Pa. Stat. and Cons. Stat. Ann. § 7301 (c) (West Supp. 2020); see *Friends of Danny DeVito* v. *Wolf*, Pa. , 227 A.3d 872, 892–93, cert. denied, U.S. , 141 S. Ct. 239, 208 L. Ed. 2d 17 (2020); see also *Wolf* v. *Scarnati*, Pa. , 233 A.3d 679, 705 (2020) (recognizing that court had determined in *Friends of Danny DeVito* that Pennsylvania governor's exercise of authority delegated under Emergency Management Services Code did not violate sepa-

ration of powers doctrine under Pennsylvania constitution). The court noted in *Scarnati* that the "[Pennsylvania] General Assembly, in enacting the statute, 'ma[de] the basic policy choices.' . . . The General Assembly decided that the [g]overnor should be able to exercise certain powers when he or she makes a 'finding that a disaster has occurred or that the occurrence of the threat of a disaster is imminent.' " (Citation omitted.) *Wolf* v. *Scarnati*, supra, 704. The court also explained that "the [Pennsylvania] General Assembly . . . provided 'adequate standards which will guide and restrain' the [g]overnor's powers. . . . The General Assembly gave the [g]overnor specific guidance about what he can, and cannot, do in responding to a disaster emergency. . . . *The powers delegated to the [g]overnor are admittedly [far reaching], but nonetheless are specific.* For example, the [g]overnor can '[s]uspend the provisions of any regulatory statute . . . if strict compliance with the provisions . . . would in any way prevent, hinder or delay necessary action in coping with the emergency.' . . . *Broad discretion and standardless discretion are not the same thing. Only those regulations that hinder action in response to the emergency may be suspended.* It may be the case that the more expansive the emergency, the more encompassing the suspension of regulations. But this shows that it is the scope of the emergency, not the [g]overnor's arbitrary discretion, that determines the extent of the [g]overnor's powers under the statute. The General Assembly itself chose the words in [the Emergency Management Services Code]. The General Assembly, under its lawmaking powers, could have provided the [g]overnor with less expansive powers under the Emergency Management Services Code. It did not do so." (Citations omitted; emphasis altered.) Id., 704–705.

The Supreme Court of Oregon has similarly reasoned that, although the emergency powers of the governor of Oregon are broad under that state's statutory scheme, they are not unlimited. *Elkhorn Baptist Church* v. *Brown*, supra, 366 Or. 525. The court reasoned that the governor's actions must be "exercised in a manner consistent with the reason for which they are granted; that is, they must be exercised to address the declared emergency. . . . Second, the [g]overnor's emergency powers . . . may be exercised only during a declared state of emergency, [and Oregon's emergency powers law] requires the [g]overnor to terminate by proclamation when the emergency no longer exists, or when the threat of an emergency has passed." (Internal quotation marks omitted) Id., 525–26. Finally, the court noted that the courts may intervene if the governor's regulations exceed constitutional limits. Id., 526.

Likewise, the Supreme Court of Kentucky held that the extent of the Kentucky governor's authority during an emergency was not an unconstitutional delegation of legislative authority in violation of the separation of

powers provisions of the Kentucky constitution. *Beshear* v. *Acree*, supra, 615 S.W.3d 806, 812. The court acknowledged that the governor's authority is broad, but, "[g]iven the wide variance of occurrences that can constitute an emergency, disaster or catastrophe, the criteria are necessarily broad and result-oriented, protect life and property . . . and . . . public . . . health . . . allowing the [g]overnor working with the executive branch and emergency management agencies to determine what is necessary for the specific crisis at hand. Floods, tornadoes and ice storms require different responses than threats from nuclear, chemical or biological agents or biological, etiological, or radiological hazards but the emergency powers are always limited by the legislative criteria, i.e., they must be exercised in the context of a declared state of emergency . . . designed to protect life, property, health and safety and to secure the continuity and effectiveness of government . . . and exercised to promote and secure the safety and protection of the civilian population." (Citations omitted; internal quotation marks omitted.) Id., 811.

The Supreme Judicial Court of Massachusetts also recently rejected a separation of powers challenge to the Massachusetts governor's authority to issue emergency orders. *Desrosiers* v. *Governor*, supra, 486 Mass. 382, 384–85. The court reasoned that, "because the [g]overnor's actions were carried out pursuant to the authority granted to the [g]overnor in the [Massachusetts Civil Defense Act], the emergency orders [did] not violate [the separation of powers provision of the Massachusetts constitution]." Id., 382. The court also noted that the act did not interfere with the functions of the legislature. Id., 383.

The plaintiffs, however, point to a recent decision of the Supreme Court of Michigan that they claim supports their contention that § 28-9 (b) (1) and (7) is an unconstitutional delegation of legislative authority. In a divided opinion, the Michigan high court concluded that the governor of Michigan did not possess the authority to exercise emergency powers under the Michigan Emergency Powers of the Governor Act because that act was an unlawful delegation of legislative power to the executive branch in violation of the Michigan constitution. *In re Certified Questions from the United States District Court, Western District of Michigan, Southern Division*, 506 Mich. 332, 372, 958 N.W.2d 1 (2020). The court reasoned that the powers conferred by the act were "remarkably broad"; id., 363; and there were not sufficient standards in place to constrain the governor's actions. See id., 367–71. The plaintiffs in the present case contend that, as with the Michigan statute, subection (b) (1) and (7) "impermissibly confers truly unlimited power on the governor . . . ." We are not persuaded. As the Chief Justice of the Michigan Supreme Court noted in her concurring and dissenting

opinion in that case, the statute does not violate the separation of powers provision because "there are many ways to test the [g]overnor's response to this life-and-death pandemic." *In re Certified Questions from the United States District Court, Western District of Michigan, Southern Division*, supra, 422 (McCormack, C. J., concurring in part and dissenting in part). Namely, "the statute allows a legal challenge to the [g]overnor's declaration that COVID-19, as a threshold matter, constitutes a 'great public crisis' that 'imperil[s]' 'public safety.' . . . For another example, any order issued under the statute could be challenged as not 'necessary' or 'reasonable' to 'protect life and property or to bring the emergency situation within the affected area under control.' . . . In these ways and others, the courts can easily be enlisted to assess the exercise of executive power, measuring the adequacy of its factual and legal bases against the statute's language." (Citations omitted.) Id. The Chief Justice also noted that the legislature itself might revisit its decision to have passed the statute in the first place. Id. Specifically, "[i]f the [l]egislature saw fit, it could repeal the statute. Or, the [l]egislature might amend the law to alter its standards or limit its scope. Changing the statute provides a ready mechanism for legislative balance." Id. The Chief Justice further explained that the governor is also politically accountable to voters, which serves as an additional check. Id. Finally, the Chief Justice noted that the majority had departed from one part of their long-standing test for delegation of legislative power, namely, that "the standard must be as reasonably precise as the subject matter requires or permits." Id., 423 (McCormack, C. J., concurring in part and dissenting in part). We find the reasoning of the Chief Justice's concurrence and dissent to be more persuasive.

As we noted in our per curiam ruling in the present case, we are mindful of the incredibly difficult economic situation that the plaintiffs and thousands of others across the state are in given the COVID-19 pandemic. Individuals and families have been economically upended as a result of the pandemic. We are also mindful of the more than 300,000 Connecticut residents who have been infected with COVID-19 and, most tragically, the nearly 8000 Connecticut citizens who have passed away in the more than yearlong pandemic. As we explained, the governor is charged with protecting the health, safety, and welfare of the citizens of this state, and the COVID-19 pandemic has presented a dynamic and unpredictable "serious disaster." The question of when various restrictions imposed as a result of the pandemic should be lifted is a fact intensive inquiry that involves an understanding of ever evolving scientific guidance, including the effects and impacts of newly discovered strains of the virus and their resistance to recently approved vaccines. It is likely that reasonable minds may differ as to when each restriction should be

lifted, but, as Chief Justice Roberts explained, "[w]hen [elected] officials undertake . . . to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad." (Internal quotation marks omitted.) *South Bay United Pentecostal Church* v. *Newsom*, supra, 140 S. Ct. 1613 (Roberts, C. J., concurring in denial of application for injunctive relief). As long as Governor Lamont is acting within this admittedly broad statutory and constitutional authority—which we conclude that he is—it is not the job of this court to second-guess those policy decisions.

The judgment is affirmed.

In this opinion the other justices concurred.

* March 29, 2021, the date that this decision was released as a slip opinion, is the operative date for the beginning of all time periods for the filing of any postopinion motions or petitions.

[1] See Coronavirus Resource Center, Johns Hopkins University & Medicine, COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at John Hopkins University (JHU), available at https://coronavirus.jhu.edu/map.html (last visited March 29, 2021); Connecticut Department of Public Health, Connecticut's COVID-19 Response, available at https://portal.ct.gov/coronavirus (last visited March 29, 2021).

[2] In addition to Executive Order Nos. 7D, 7X, 7MM, and 7ZZ, the provisions of which we have set forth in the text of this opinion, Executive Order No. 7G clarified the limits of Executive Order No. 7D on businesses such as the pub, allowing them "to sell sealed containers of alcoholic liquor for [pickup] at such restaurant, café or tavern" under certain conditions, including a requirement that the alcohol purchase "accompany a [pickup] order of food prepared on the premises . . . ." Executive Order No. 7G (March 19, 2020). Executive Order No. 7N directed businesses that remained open to serve food and drink for off-premise consumption to "limit entrance of customers into their locations to the minimum extent necessary to pick up and/or pay for orders, use touchless payment systems, and require remote ordering and payment . . . ." Executive Order No. 7N (March 26, 2020). Executive Order No. 7T expanded the list of sealed containers of alcohol that liquor permit holders could sell under the conditions set forth in Executive Order No. 7G.

[3] Oral argument was conducted using remote technologies because the Superior Court buildings at the time were closed to the public for most purposes as a result of the pandemic.

[4] Following oral argument, we ordered the parties to file supplemental briefs addressing the questions of whether Governor Lamont abandoned reliance on § 19a-131a as a legal basis to support the challenged executive orders and, assuming he did not, whether his authority resulting from a public health emergency declaration, alone, supports the challenged executive orders. In their supplemental brief, the plaintiffs contend, as the trial court concluded, that Governor Lamont abandoned reliance on § 19a-131a. Assuming he did not abandon reliance on § 19a-131a, the plaintiffs claim that the governor's authority resulting from a public health emergency, alone, does not support any of the challenged executive orders. Governor Lamont contends that he has not abandoned reliance on § 19a-131a as a legal basis to support the actions taken pursuant to § 28-9 (b) (1). He also contends, however, that he can rely on § 19a-131a as authority to issue only Executive Order Nos. 7MM and 7ZZ because those are the only orders that fall within the governor's authority to modify statutes during a public health emergency pursuant to § 28-9 (b) (1). Because the parties agree that § 19a-131a, alone, does not provide authority for Governor Lamont to issue all of the challenged executive orders, we must consider whether § 28-9 provides that authority.

[5] We subsequently discuss in this opinion whether there is any analytic difference between a "serious disaster" and a "major disaster," and conclude there is not.

[6] The Pennsylvania Supreme Court recently reached a similar conclusion under Pennsylvania law. See *Friends of Danny DeVito* v. *Wolf*, Pa. , 227 A.3d 872, 888–89, cert. denied, U.S. , 141 S. Ct. 239, 208 L. Ed. 2d 17 (2020). Under state law, the governor of Pennsylvania is authorized

to declare a disaster emergency "upon finding that a disaster has occurred or that the occurrence or the threat of a disaster is imminent." 35 Pa. Stat. and Cons. Stat. Ann. § 7301 (c) (West Supp. 2020). The Pennsylvania Emergency Management Services Code defines "disaster" as "[a] man-made disaster, natural disaster or war-caused disaster." 35 Pa. Stat. and Cons. Stat. Ann. § 7102 (West Supp. 2020). Similar to the definition of "major disaster" in § 28-1 (2), the Pennsylvania Emergency Management Services Code defines "natural disaster" as "[a]ny hurricane, tornado, storm, flood, high water, wind-driven water, tidal wave, earthquake, landside, mudslide, snowstorm, drought, fire, explosion *or other catastrophe which results in substantial damage to property, hardship, suffering or possible loss of life.*" (Emphasis in original.) 35 Pa. Stat. and Cons. Stat. Ann. § 7102 (West Supp. 2020). The plaintiffs in *Friends of Danny DeVito* claimed that the COVID-19 pandemic was not a "natural disaster" because it was "not of the same type or kind" as those listed in the statutory definition in § 7102. *Friends of Danny DeVito* v. *Wolf*, supra, 888. The Pennsylvania Supreme Court rejected this argument and concluded that the COVID-19 pandemic qualified as a natural disaster. Id. The court explained that the "specific disasters in the definition of 'natural disaster' themselves lack commonality"; id.; and, by "including the language 'other catastrophe which results in substantial damage to property, hardship, suffering or possible loss of life,' it [was] clear that the General Assembly intended to *expand* the list of disaster circumstances that would provide [the Pennsylvania governor] with the necessary powers to respond to exigencies involving vulnerability and loss of life." (Emphasis in original.) Id., 889.

[7] Indeed, we note that General Statutes § 28-9a, which sets forth additional actions the governor may take in the event of an emergency or major disaster, explicitly provides that " '[m]ajor disaster,' 'emergency' and 'temporary housing' as used in this section have the same meanings as the terms are defined, or used, in the [federal] Disaster Relief Act of 1974 . . . ." (Citation omitted.) General Statutes § 28-9a (d).

[8] Just as the federal government was faced with major logistical challenges in order to stem the spread of COVID-19, such as distributing supplies from a national stockpile, so, too, was this state. Chapter 517 contains various provisions that demonstrate the need for a civil preparedness emergency to address the logistical challenges posed by a pandemic of the magnitude presented by the COVID-19 pandemic. See General Statutes § 28-1 (4) (defining "civil preparedness" to include "all those activities and measures designed or undertaken (A) to minimize or control the effects upon the civilian population of major disaster or emergency" such as "the procurement and stockpiling of necessary materials and supplies"); General Statutes § 28-11 (a) (during civil preparedness emergency or public health emergency, governor may take possession "(3) of any antitoxins, pharmaceutical products, *vaccines* or other biological products" (emphasis added)); General Statutes § 28-16 ("commissioner [of emergency services and public protection] is empowered, in anticipation of . . . any disaster, to purchase and maintain a stockpile of medical supplies . . . and any other supplies which in his opinion are necessary and desirable to afford relief and assistance to the people of the state in an emergency"). These provisions make clear that civil preparedness emergencies, under § 28-9, and public health emergencies, under § 19a-131a, are related and interconnected.

[9] Section 28-1 (2) also provides that a "major disaster" includes "any catastrophe" that "(A) in the determination of the President, causes damage of sufficient severity and magnitude to warrant major disaster assistance under the [Stafford Act] . . . to supplement the efforts and available resources of this state . . . in alleviating the damage, loss, hardship, or suffering caused by such catastrophe . . . ." As we have explained, President Trump's determination that the impacts of the COVID-19 pandemic on this state were "of sufficient severity and magnitude to warrant a major disaster declaration under the [Stafford Act]"; Federal Emergency Management Agency, supra, 85 Fed. Reg. 31,542; provides further support for the conclusion that the COVID-19 pandemic constitutes a serious disaster.

[10] There are numerous statutory examples of the General Assembly's delegating to the governor the responsibility of protecting the people of this state. See, e.g., General Statutes § 3-1 (governor shall "take any proper action concerning . . . the enforcement of the laws of the state and the protection of its citizens"); General Statutes § 3-6a (governor may restrict "movement of persons and vehicles upon the streets and highways of the state" during "extreme weather conditions or other acts of nature"); General Statutes § 16a-11 (governor may declare "energy emergency" and order energy emer-

gency plan); General Statutes § 19a-70 (governor may proclaim emergency due to short supply of "antitoxin or other biologic product" during epidemic and appoint advisory committee to recommend "the priority of the supply, distribution and use of such biologic products in the interest of the health, welfare and safety of the people of the state").

[11] We acknowledge that the governor has twice renewed the civil preparedness emergency and, at the same time, declared new civil preparedness emergencies, and has renewed the executive orders modifying or suspending statutes and regulations. The statutory six month temporal limitation, however, requires the governor, at a minimum, to continuously evaluate the necessity of the executive orders and to justify their continued existence. As we discuss hereinafter, although this is a broad grant of authority, and there may well be instances in which a challenger to the governor's continued actions can demonstrate that they have lasted an improper duration, that issue is not squarely before us, and nothing in this opinion should be construed as offering an opinion on that separate issue. Indeed, the plaintiffs do not challenge the governor's renewal of the emergencies. Similarly, the plaintiffs acknowledge that they "are not challenging the good intentions of [Governor Lamont] in issuing his executive orders" and "are not asking [this] court to second-guess the policy judgments of [Governor Lamont] or to determine whether his executive orders and the sector rules make sense or are fair."

[12] We note that "[o]nly twice in this country's history (and that in a single year) [has the United States Supreme Court] found a delegation excessive—in each case because Congress had failed to articulate *any* policy or standard to confine discretion." (Emphasis in original; internal quotation marks omitted.) *Gundy* v. *United States*, supra, 139 S. Ct. 2129 (plurality opinion).

[13] We note that several members of the committee, including Senator Fasano and Representative Aresimowicz, noted that the committee was not authorized to take any action with respect to Governor Lamont's actions pursuant to the civil preparedness emergency declaration. See, e.g., Declaration of a Public Health Emergency Committee Meeting, supra, (08:27 through 09:06), remarks of Senator Fasano; id., (09:13 through 09:42), remarks of Representative Aresimowicz. As we previously discussed in this opinion, we fail to see why the legislature chose not to include a provision for legislative oversight of a governor's proclaimed civil preparedness emergency, other than for a man-made disaster. Certainly, this could be addressed by the General Assembly in its current, or a future, legislative session, if the legislature deems it appropriate.

---